IRA S. BUSHEY & SONS, Inc. v. W. E. HEDGER TRANSP. CORPORATION.

No. 97, Docket 20747.

Circuit Court of Appeals, Second Circuit.

Feb. 27, 1948.

FRANK, Circuit Judge, dissenting.

Horace M. Gray, of New York City, for respondent-appellant.

Christopher E. Heckman, of New York City (Foley & Martin and James A. Martin, all of New York City, on the brief), for libellant-appellee.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This is a later stage of a case previously before us and reported as W. E. Hedger Transp. Corp. v. Ira S. Bushey & Sons, 2 Cir., 155 F.2d 321. That appeal involved solely a question of jurisdiction. Hedger, the owner of tugs and vessels subject to a preferred ship mortgage, had consented to a decree of the district court, March 8, 1945, foreclosing the mortgage. Then on April 4, 1945, it instituted a suit by summons and complaint asking for the vacation of the consent decree, an accounting, damages, and other relief. The district court dismissed this suit for lack of jurisdiction, holding that its powers would be limited to consideration of a libel in review, to the exclusion of a "bill in equity to nullify the consent decree and to recover damages." This court agreed with the lower court on the issue of substance, holding that its powers were restricted by the limitations of federal jurisdiction to what it could appropriately do on a libel in review or, within the term, a petition to vacate the decree; it differed with the district judge as to the procedure, however, since it thought that the so-called complaint would actually fulfill all the functions of such a libel or petition. Accordingly it affirmed the decree so far as that dismissed a claim of a third individual (Hedger individually), but reversed it as to the Hedger Company and directed that the complaint be considered a petition in the foreclosure suit to vacate the decree. It did, however, exclude therefrom certain claims for damages for abuse of process and for repayment of sums paid under a mutual mistake of fact (Arts. 67-69 of the complaint) as not being within the admiralty jurisdiction. It expressly refrained from passing upon the legal sufficiency of the complaint as a petition for the purposes stated.[1]

Upon the going down of the mandate the district court transferred the case from its equity docket to the admiralty docket as a part of the former foreclosure case. Then it set the case for a hearing before the same judge who presided at the foreclosure hearing. He heard the parties and thereafter dismissed the complaint for legal insufficiency, writing a lengthy opinion, 70 F.Supp. 578. Respondent then filed a motion to expunge this opinion on the grounds that there was no motion regularly before the court and that the judge was disqualified, since he had conducted the original foreclosure hearing. This was heard and denied by another district judge. Next respondent filed a motion to vacate the decree, which was heard and denied by the original judge upon consideration of a further brief from respondent. This appeal is from not only the original decree of dismissal, but also the two further orders denying respondent's motions.

The substantial question on this appeal is whether the "complaint," now become a petition to reopen and vacate,

1 " * * * the cause will be remanded with instructions to treat the complaint as a petition in the foreclosure suit to reopen the decree upon the grounds therein alleged, on whose sufficiency, however, we are not to be understood to pass. Our decision is no more than that the admiralty court had jurisdiction in the foreclosure suit to give all the relief that the district court had power to give in any capacity, and that it was possible and proper to treat the complaint as a petition in that suit for all such relief, though for no other relief." W. E. Hedger Transp. Corp. v. Ira S. Bushey & Sons, 2 Cir., 155 F.2d 321, 325.

is sufficient in law, or more particularly whether it shows a legal basis for vacating a formal decree of the district court. True, respondent also states, without argument, its contention that it was denied due process of law by reason of the disqualification of the judge and the latter's treatment and dismissal of the petition. But in any event we can see no error here if the judge's main legal conclusion was and is sound. The mandate of this court directed certain actions by the district court, and no motion of the parties was necessary to stimulate the judge to obedience. We see no ground of disqualification in that the issue was referred to the judge who should know most about it—a course which seems sensible and is not a statutory ground of disqualification. 28 U.S.C.A. § 24. Nor are we cited to precedents otherwise. Compare Frank, Disqualification of Judges, 56 Yale L. J. 605 et seq. And the judge certainly allowed respondent full opportunity to present its legal claims, as we are doing on this appeal. We are sure that respondent has been deprived of no constitutional or other rights by the course the proceedings have taken, and we pass therefore to the substantive issue decided below in libellant's favor.

██ The petition is long and detailed, containing seventy-one paragraphs or Articles, of which, as we have seen, three have been eliminated on the previous proceedings. It also contains seven prayers for relief. Not unnaturally for so lengthy a document it tends to be both verbose and abstract and conclusory in its allegations. Nevertheless, the main gravamen of the petition, as we pointed out in the earlier appeal, can be discovered; and we are now aided by the complete record of the earlier hearing. Respondent complains because the trial judge in his opinion regretted the absence of these records before the court on the earlier appeal, "as they will be in an appeal from this decision," 70 F.Supp. 578, 581, saying that this constitutes an admission that the judge considered proceedings in the foreclosure action. But he would have been remiss in his complete consideration of the case had he not done so to the extent that they were relevant. It is of course thoroughly settled that the court takes judicial notice of its own records, particularly in the very case;[2] and it is hard to see how a petition to vacate a decree can be intelligently appraised without examining the circumstances under which the decree was entered. Here the transcript of the earlier hearing adds life and color to what doubtless would be apparent from the more formal documents of record and furnishes the background against which this quite remarkable claim must be viewed.

The proceedings began in a normal way in the district court on February 10, 1945, with a libel for a foreclosure of a preferred ship mortgage and the issuance of process in rem against the vessels. This is not only usual, but is also the only way of proceeding in the case of these mortgages, which since 1920 have been brought within the exclusive jurisdiction of admiralty. 46 U.S.C.A. § 951, providing for enforcement "by suit in rem in admiralty," with original jurisdiction granted "to the district courts of the United States exclusively."[3] After

[2] Nahtel Corp. v. West Virginia Pulp & Paper Co., 2 Cir., 141 F.2d 1, citing Butler v. Eaton, 141 U.S. 240, 11 S.Ct. 985, 35 L.Ed. 713; Lesnik v. Public Industrials Corp., 2 Cir., 144 F.2d 968, 972; I. & I. Holding Corp. v. Greenberg, 2 Cir., 151 F.2d 570, certiorari denied 327 U.S. 781, 66 S.Ct. 681, 90 L.Ed. 1009; Gilbert v. General Motors Corp., 2 Cir., 133 F.2d 997, 1003, certiorari denied 319 U.S. 743, 63 S.Ct. 1031, 87 L.Ed. 1700; Crichton v. United States, D.C.S.D.N.Y., 56 F.Supp. 876, 880, affirmed 323 U.S. 684, 65 S.Ct. 559, 89 L.Ed. 554; Freshman v. Atkins, 269 U.S. 121, 124, 46 S.Ct. 41, 70 L.Ed. 193; Bienville Water Supply Co. v. City of Mobile, 186 U.S. 212, 217, 22 S.Ct. 820, 46 L.Ed. 1132. The rule extends even to records of other cases in the same court. National Fire Ins. Co. of Hartford v. Thompson, 281 U.S. 331, 336, 50 S.Ct. 288, 74 L.Ed. 881; Goldstein v. Groesbeck, 2 Cir., 142 F.2d 422, 426, 154 A.L.R. 1285, certiorari denied 323 U.S. 737, 65 S.Ct. 36, 89 L.Ed. 590.

[3] The Ship Mortgage Act of 1920 was a novel attempt to support the merchant marine and to afford a better market for ships of the United States Shipping Board. Before that no mortgage foreclosure could be had in admiralty; its constitutionality was sustained in The Thomas Barlum, 293 U.S. 21, 42, 55 S.

citation and notice to the Hedger Company, the owner and respondent-appellant here, the latter on February 21, 1945, filed its answer, in which, while it admitted the execution of the preferred mortgage of March 21, 1939, it denied that it received good and valid or adequate consideration for the notes secured, as well as "any present obligation to pay any sum of money or interest to the libellant." It then went on to state in some detail its defense which again figures prominently in the present proceedings. This grows out of an asserted joint venture between the Hedger and Bushey interests beginning on July 30, 1932, from operation of the Hedger boats, purchased upon foreclosure by the New York Scow Corporation, a Bushey subsidiary, and then subjected to a mortgage of about $155,000 to a third party. The Hedger Company was formed to operate the vessels and to pay off the indebtedness. According to respondent's assertions a large sum of money had been paid from the earnings by the 23d day of December, 1938, but the Bushey interests then represented to Hedger that there was approximately $400,000 due on open account and that certain other boats should be purchased for $200,000, with the result that certain transactions were had by which the Hedger Company gave the mortgage in question to the Scow Corporation on March 21, 1939, for $600,000, $400,-000 representing the amount claimed for barge and tug·hire and repairs, and the balance the purchase price of the additional vessels. It was asserted that these amounts were not due, although Hedger was unable to obtain an accounting from the libellant, now assignee of the mortgage. Further, it was said that on December 21, 1944, the Hedger Company and Hedger individually had brought an action in the Supreme Court of the State of New York against the Bushey interests to compel an accounting. The answer concluded with not only general prayers for dismissal of the libel, for damages, and for other and further re- lief, but specific prayers that the action be deferred until the conclusion of the state court action, that a joint receiver with Hedger be appointed under 46 U.S.C.A. § 952 to operate the vessels, and that, if the court determined that it would proceed in this action without regard to the state court action for an accounting, then the matter be referred to a special master for an accounting between the parties. .

No attempt having been made by respondent to secure release of the vessels, permitted by filing a bond or security pursuant to the statute, 28 U.S.C.A. § 754, Admiralty Rule 12, 28 U.S.C.A. following section 723, or the local rule, E.D.N.Y. Admiralty Rule XXI, the libellant took steps to ask for an immediate hearing, which the court proceeded to grant. This was also in accordance with a local rule to avoid long and expensive custody of many vessels, here 32 in number, by the United States marshal. Respondent, however, made extensive efforts to delay the hearing, by direct application, by filing exceptions to answers which the libellant had made with promptness to its interrogatories, by asking for preliminary hearing on such exceptions, and so on. This is a significant feature of this case in connection with respondent's main contention on this appeal, namely of coercion through libellant's abuse of process. The normal form of such duress is by steps taken to prevent a litigant from reaching a court to protect his interests. Here the situations are reversed. At all times the party accused of the abuse is endeavoring to get before the judge and to have the case thoroughly heard, while the party who claims to be the victim has strenuously opposed such judicial hearing.

In any event the court did set the trial for March 7, 1945, and it began on that day before Judge Byers. The record of the hearing discloses how thoroughly the points at issue and the respective positions of the parties were explored with the judge. An opening statement on behalf of the libellant

Ct. 31, 37, 79 L.Ed. 176, which states, "If a mortgage is within the Act, there can be no suit to foreclose it in a state court; if the mortgage is not within the Act, there can be no suit for foreclosure in the admiralty." Preferred mortgages are defined in 46 U.S.C.A. § 922, and the priority of their lien is stated in § 953. See Robinson on Admiralty 1939, 195, 196, 440–450; cf. Morrison, The Constitutionality of the Ship Mortgage Act of 1920, 44 Yale L.J. 1.

called attention to much of the dispute, with a direct statement of the state court action for an accounting. Libellant's counsel pointed out that of the original $600,000 mortgage there was a forgiveness of about $290,000, and an application of payments out of earnings reducing the sum until, as it was asserted, the parties agreed in 1944 that it was $115,000, which was covered by installment notes, of which the failure to pay one then due had led to the proceedings. Then respondent's counsel in his opening statement immediately went back to the joint venture starting in 1932 and made his general position quite dramatically clear. Thus he said, among other things, that the Hedger interests had turned over to Bushey over $1,000,000 in cash and property during the period, and that "Mr. Bushey and his associates have been milking the Hedger Company and Mr. Hedger for some twelve years and had them right by the scruff of the neck where they could not help themselves because of the various amounts that they claimed to be owing at that time." As a result of this fairly extensive discussion the court said to respondent's counsel: "In other words, you claim that the amount said to be due is not due?" and receiving the answer, "That's right," made the rather natural response: "Then it seems to me, my duty to go ahead and take testimony." Counsel agreed, but stated he was not prepared to go ahead with all his evidence that day, to which he received the courteous response from the court that "you may be assured that you are not going to be forced. I have tried to make that clear."

But before going to the testimony respondent's counsel went on to say that he had tried to tender the amount due in order to have the boats released, so that they would not be idle and held up, and to allow the accounting issues to be tried either later in the federal action or in the state court. In reply, libellant's counsel stated his willingness to accept an adequate tender, but asserted that the tender was never accompanied by the production of the money and was always conditioned by a demand for a full release of the mortgage. There ensued a long discussion among court and counsel thoroughly exploring issues which respondent would now reopen. As it turned out, the parties had little or no dispute as to the amount to be covered by the tender. In its libel, libellant had claimed the sum of $73,766.66, which included $60,700 indebtedness, interest, and attorneys' fees, the latter set at $10,000. The amount offered by respondent, and which in fact became the basis of settlement, $69,491.56, was upon the same basis, with the single modification of a reduction of the attorneys' fees by one-half.

On the other hand, the real dispute at this time was as to the form and circumstances under which the tender should be made, in the light of its possible legal effect upon the issues in litigation between the parties. Respondent repeatedly sought an agreement for acceptance of the tender and complete release of the mortgage security, together with a reservation of all its asserted rights to be tried out later in the accounting between the parties. This libellant resisted, making the formal objection that there had been no actual or unconditional tender of the money and explaining further that acceptance of anything but an unconditional tender would prejudice it from asserting what it felt to be its full rights on an accounting. It had already served notice of an intention to amend its libel to claim approximately $25,000 more asserted to be due on further installment notes; and it said that the results of a full accounting might well be not a reduction, but a substantial increase, of the claim. During the course of the hearing the judge also explored the possibility of a bond or deposit of the money as security. Nevertheless respondent continued to assert its position that any security furnished should be a complete substitute for the vessels, though with all its rights reserved; and libellant stood on its contention that any such security, not offered as payment of the indebtedness, should cover also the additional amount it was prepared to claim. It appeared, however, that respondent was prepared to obtain the money represented by its offer from a bank whose counsel was in attendance at the hearing, the money to be advanced on release of the mortgage, thus making the vessels available as security to the bank.

The court adjourned the discussion over the noon recess in order to afford the parties an opportunity for adjustment. But since that did not occur, the court accepted the inevitable consequence for which the libellant was asking, namely that the trial must proceed. Respondent objected that a trial would be a long drawn-out affair, but was disputed by libellant's counsel, who wondered "if it would take more than a half hour. The libellant's case will go in in ten minutes." But the court directed the trial to proceed, and the libellant proceeded with its testimony, with the original mortgage received in evidence as Libellant's Exhibit 1.

At that point respondent's counsel requested a recess for a conference with his client. Then after a short recess he made an unconditional tender, which libellant agreed to accept as such, giving satisfaction pieces on receipt of the money. The case was then adjourned until the next morning in order that the money might be produced at the Customs House, where the mortgage had been recorded and the satisfactions were to be recorded. When the hearing was resumed the next morning, respondent's counsel stated that they were ready "to have your Honor sign a decree under our tender of yesterday afternoon." A colloquy disclosed that satisfactions were being held in the Customs House, together with the mortgage, to await a consent decree, after which the money would be paid and the releases given. Respondent's counsel thus specifically requested the signing of the decree, which, indeed, carries the endorsement of his consent, as well as that of the proctors for the libellant. This decree orders recovery of the sum of $69,491.56 "from the barges attached herein and the respondent" and release of the attached vessels upon payment of this amount and of all clerk's and marshal's fees. Payment was then made, the satisfactions were given, and the vessels were released.

When the complaint or petition was filed less than a month later, it repeated the contentions of respondent's answer as to the joint venture in essentially the same language. Then it alleged duress on the part of libellant, in that the latter, knowing of respondent's financial needs and the necessity of keeping the boats in operation, particularly because of important pending contracts, forced respondent to pay the sum stated to secure the release of vessels reasonably worth in excess of $250,000. It should be noted that respondent does not seriously criticize the original institution of the foreclosure action. It could hardly do so in view of the exclusive nature of the remedy in admiralty to enforce a preferred ship mortgage. Certainly realization upon the security of such a mortgage cannot be defeated by the mere device of institution of a state court action covering somewhat the same ground.[4] The claim of duress is, however, for the pressure exerted by libellant to have the hearing proceed until and unless the money were paid. That is the sum and substance of the case. It should be noted that the court never did get to the questions of appointing a receiver or a special master or of granting any of the special relief requested in respondent's answer. We do not now know how much of this might have been granted had the hearing proceeded. Respondent finds something coercive in libellant's reference to its further claim of approximately $25,000; but there seems nothing illegal or improper in a statement by libellant of its utmost claims to the judge. Certain general allegations that the libellant was attempting to stir up other litigation against respondent are removed from this case by our previous holding as to the restrictions of admiralty jurisdiction. Hence we have the single bare point whether libellant's action in pressing the libel to trial before Judge Byers until respondent actually produced and paid the money unconditionally was such "economic duress" as to justify the almost immediate upsetting of the formal court decree.

▮ Here the main gist of respond-

---

4 Even had the admiralty jurisdiction not been exclusive, the defense of another action pending in the state court could not have prevailed. McClellan v. Carland, 217 U.S. 268, 30 S.Ct. 501, 54 L.Ed. 762; Stanton v. Embrey, 23 Wall. 548, 93 U. S. 548, 23 L.Ed. 983; 1 Moore's Federal Practice 236; cf. Sutcliffe Storage & Warehouse Co. v. United States, 1 Cir., 162 F.2d 849, 851, and cases cited.

ent's argument is that libellant was acting oppressively in asking unconditioned payment and refusing to accept the money in place of the vessels while the issue as to the fact or amount of indebtedness was being litigated later. Respondent cites and relies upon the well-established principle that security given to release a vessel arrested in admiralty proceedings in rem takes the place of the res for all purposes and hence does more than merely restore possession of the vessels. United States v. Ames, 99 U.S. 35, 25 L.Ed. 295; The Susana, 4 Cir., 2 F.2d 410; The Fred M. Lawrence, 2 Cir., 94 F. 1017, 1018; J. K. Welding Co. v. Gotham Marine Corp., D.C.S.D. N.Y., 47 F.2d 332; The Morning Star, D.C.E.D.N.Y., 5 F.Supp. 502; 2 Benedict on Admiralty, 6th Ed. 1940, § 378; 25 Col. L.Rev. 665. How far this principle is applicable to proceedings under the Ship Mortgage Act has not been determined, though we recognize the force of respondent's legal contention.[5] Even so, we do not see how it helps respondent here. If sound, it meant that the vessels were available as security for a bank loan to provide either a deposit or payment. That would leave as the only proper dispute between them at this time the amount of the security in ths light of libellant's proposal to amend its demand if the amount due was to be later litigated. How far in addition libellant was prepared to controvert respondent's claim of law never became clear; for the issue remained academic in the absence of any actual tender of security by respondent. Libellant's continued emphasis upon the amount of the bond and a not wholly unnatural failure to distinguish in the discussion between release of the security and release of the debt might indeed suggest that it was not prepared to refuse a substitution of fully adequate security. But the important point is that libellant at most asked only for its asserted legal rights or alternatively for the immediate hearing which the court stood ready to give. Libellant is hardly to be charged with duress for merely stating its claims in the presence of a court ready to afford complete protection against injustice or overreaching. Nor is the court to be charged with a callous disregard of the respondent's rights in its quite patient exploration of the alternatives of bond, deposit, payment, trial, followed by its direction for the hearing to proceed as the only way of settling the conflicting claims and ultimately by its acceptance at face value of the respondent's settlement and request for a final decree upon consent.

■ It is therefore quite clear that this was no real case of duress. Rather, it was upon the part of the respondent a choice of strategy or tactics. Admittedly and expressly the parties were determining their immediate actions at the hearing in the light of the effect of such actions upon the pending accounting wherever that might be held. Faced with the alternative of immediate settlement of the accounts, respondent deliberately chose to procure a postponement by meeting the legal conditions set by libellant. Having chosen this strategy, respondent should abide by it and not try to overturn, within a month after rendition, a formal court decree which it itself had sought for the purposes it had immediately in view. How far its strategy may permanently prejudice or reduce its further claims in its pending state court action is not for us to attempt to say. There involved are other debts and other mortgages, as well as the whole series of transactions long antedating this present mortgage. It is obviously the task of that court, if the issues go to trial, to disentangle and settle all the other conflicts which divide the parties.

■ Nevertheless on this appeal respondent asks us to discount the history of the case as thus clearly disclosed by applying

---

[5] The Ship Mortgage Act was obviously drawn in the light of this admiralty principle and appears to accept it; for 46 U.S.C.A. § 951 expressly makes the mortgage a lien enforceable only in admiralty, and 46 U.S.C.A. § 953(b) states rules of priority among maritime liens which would obviously be seriously disturbed if the giving of security released the liens, but not the mortgage. The suggestion of the district court that there is no provision for such release in the Act seems unpersuasive, for discharge of record by the mortgagee—on court order if necessary—would seem both the normal and the appropriate step.

the well-known and useful rule that upon dismissal of a pleading upon motion all intendments are taken in favor of the pleader, in the endeavor to support the allegations so far as possible. The difficulty with this is that it is controlled by a presently more important, apposite, and well-settled principle of law that the petition must be read as though it included the facts of which the court takes judicial notice, even though these may be contrary to some of the allegations. Jones v. United States, 137 U.S. 202, 214-217,11 S.Ct. 80, 34 L.Ed. 691; Greeson v. Imperial Irr. Dist., 9 Cir., 59 F.2d 529, 530; Verde River Irr. & Power Dist. v. Salt River Valley Water Users' Ass'n, 9 Cir., 94 F.2d 936, 938; Walsh v. Trustees of New York & Brooklyn Bridge, 96 N.Y. 427, 438; Masline v. New York, N. H. & H. R. Co., 95 Conn. 702, 111 A. 639; Morgan, Judicial Notice, 57 Harv. L. Rev. 269, 273; cases collected Clark, Code Pleading, 2d Ed.1947, 251. Indeed there would be little reason to the rule *compelling* the judge to take judicial notice of known facts (Morgan, op. cit. supra; cf A.L.I., Model Code of Evidence, 1942, Rules 801, 803; 9 Wigmore, Evidence, 3d Ed.1940, § 2583) if he must also accept contrary allegations until disproved by formal proof.

█ Here it is true respondent's petition contains several allegations which we do accept of libellant's intent and desire to take advantage of respondent's known financial stringency. But on the crucial issue whether this was illegal or improper, the allegations become vague and hesitant. Thus on the vital point as to the amount due on the mortgage there are such statements as a lack of "any or adequate" consideration for the original indebtedness; but even this indefinite charge is explained elsewhere to mean adequate consideration "beyond" various listed matters such as the original debt to a third-party mortgagee, the reasonable value of repairs, supplies, materials, labor, charter hire of and for the barges and tugs, and accrued interest. So, as to the amount due at the time of institution of the action, respondent alleges "upon information and belief" in a conclusory paragraph near the end of the petition that it did not owe libellant, but that the latter owed it, the "exact amount" being unknown

for reasons stated in an earlier paragraph. But these reasons turn out to be its lack of knowledge of the accounts and transactions; that this lack was caused by libellant's agent does not change the obvious fact that the actual state of the account is at present unknown. When these allegations are read in the light of statements by counsel at the hearing we can see that this is the case as to both parties and there is a real dispute between them as to the debt. Unless we are to indulge in the melodramatic assumption (not even claimed) that respondent's counsel was then forced not even to silence, but to a concession of what he knew to be false, the conclusion that there was a properly triable issue is unavoidable.

█ It is also true that beyond this the petition makes much of the charges that respondent was forced hastily into what should have been a long trial before a Special Master and that libellant refused to accept either security, stipulation for value, or a tender and deliver "proper satisfactions of the mortgage." As to the first charge, it is of course true that libellant pressed for immediate trial. As we have seen, however, there was nothing improper in this, and it was the indicated and desirable course, as the judge held. Respondent could not claim, as of right, the frowned-upon step of a reference (McCullough v. Cosgrave, 309 U.S. 634, 60 S.Ct. 703, 84 L.Ed. 992; Los Angeles Brush Mfg. Corp. v. James, 272 U.S. 701, 47 S.Ct. 286, 71 L.Ed. 481; Federal Rules of Civil Procedure, rule 53(b), 28 U.S.C.A. following Section 723c; Equity Rule 59, 28 U.S.C.A. § 723 Appendix); there was real doubt as to how lengthy a trial was necessary to settle the immediate matter before the court; and counsel had the judge's assurance that he would not be forced in producing his evidence. As to the second charge, respondent actually never made tender of bond, payment, or other security until the ultimate tender of payment and its acceptance. Because of this and of the uncertainty as to the law, libellant was never put to a definite choice of legal platform. The further charge that its proctors misled the court as to the law is therefore manifestly absurd. Actually libellant's counsel appear to

have shown a commendable desire throughout to seek and abide by judicial settlement of the issues; it was respondent who held back.[6]

Against this background the issues of law on this appeal seem to us both simple and clear. The Restatement of Judgments sets forth the comparatively limited grounds upon which a judgment within the court's jurisdiction and authority may be set aside. See c. 5 in general, and note § 126 for the many instances where such relief is to be denied. Of course duress preventing a party from contesting a fraudulent claim or defense is an appropriate ground for relief, § 121; but the examples cited are revealing of the kind had in mind by the restaters, as in Illustration 6, p. 592, where "A threatens to kidnap B's child if B defends the action." Further, the granting of relief is subject to the general rules of equity, §§ 127-130, and one ground of refusal is that of "contributory fault," § 129, where before or after the judgment the complainant or the person representing him "failed to use care to protect his interests," or "after ascertaining the facts the complainant failed promptly to seek redress." Here there was more than a mere failure to seek court protection; there was a deliberate choice to avoid it when the doors of justice were already open and the parties were within the temple. Such a voluntary payment

cannot be duress. Radich v. Hutchins, 95 U.S. 210, 213, 24 L.Ed. 409; Brown v. Swann, 10 Pet. 497, 505, 35 U.S. 497, 505, 9 L.Ed. 508; Brown v. Buena Vista County, 95 U.S. 157, 24 L.Ed. 422; Knox County, Mo. v. Harshman, 133 U.S. 152, 154, 10 S. Ct. 257, 33 L.Ed. 586; Pickford v. Talbott, ·225 U.S. 651, 661, 32 S.Ct. 687, 56 L.Ed. 1240; Chase Nat. Bank v. City of Norwalk, 291 U.S. 431, 440, 441, 54 S.Ct. 475, 78 L.Ed. 894.[7]

Respondent relies rather generally on cases of abuse of civil process by a litigant to secure an unjustified end. While the courts have shown a natural hesitancy to act broadly, for fear of depriving a litigant of those rights which the law accords him, yet there is undoubtedly a field for the operation of these principles, as acutely developed by Professor Dawson in his articles, "Duress Through Civil Litigation," 45 Mich.L.Rev. 571, 679. He is there dealing not with relief from judgments already rendered, but with a quasi-contractual remedy, which would not be a part of admiralty jurisdiction under our previous ruling. Reference may be made to these articles, however, for the very limitations they so pointedly suggest, such as that recovery should be only on the basis of unjust enrichment, pp. 577, 578, and that the gist of the duress is the preventing of·resort to the protective activities of a court, p. 591 et seq., p. 685 et seq.[8] Thus, stress is laid

---

[6] Libellant's counsel succinctly summarized its position, late in the hearing and after the issues had been thoroughly canvassed, when in response to the court's question, "Would you be willing to release the attachment on the boats?" he said: "If they file a bond on the amount fixed by your Honor and if you raise the amount of the libel on my motion and they bond it for that amount, of course we will release the attachment—we have no choice. We won't, however, give satisfactions and I do not think it is fair that we be asked to give satisfactions until we have the money.

"On a tender we will give satisfactions, on a bond we will release the boats."

Then the court said to respondent's counsel: "He said he would be willing to release the attachment from the boats which would result in your being able to operate them, pending the outcome of this litigation. I think that the bond only

takes the place of the boats and I do not think that that disturbs the lien of the mortgage." But the latter continued to dispute the court's ruling until the court ordered the trial to proceed.

[7] These principles of course apply to a consent decree, Snell v. J. C. Turner Lumber Co., 2 Cir., 285 F. 356, certiorari denied 261 U.S. 616, 43 S.Ct. 362, 67 L.Ed. 828; Harding v. Harding, 198 U.S. 317, 335, 25 S.Ct. 679, 49 L.Ed. 1066; indeed, the cases hold that, save for fraud, a consent judgment cannot be vacated as can an ordinary judgment in invitum. Thompson v. Maxwell Land-Grant & Ry. Co., 95 U.S. 391, 397, 24 L.Ed. 481; McArthur v. Thompson, 140 Neb. 408, 299 N.W. 519, 139 A.L.R. 413, with extensive annotation 421-455.

[8] P. 591, "Again the alleged debtor is deprived of the opportunity to litigate the merits of the dispute before application of pressure"; p. 596, "Altogether

throughout the articles on the lack of "opportunity to litigate." We have been cited to no case, and have discovered none, where relief is accorded a suitor who runs away from court, instead of toward it.

But reference to cases involving illegal or excessive attachments or other recognized abuses of process does have this relevancy that it highlights the sharp difference between them and the present case. Here we have no illegal or excessive attachment; we have only the enforcement of a mortgage in the way provided by law. The claimed abuse is that libellant refused to release the mortgage upon respondent's offer of payment. This was not a legal tender, and refusal of it in its tentative form or otherwise would not be an abuse of process in the light of the dispute actually existing as to the amount due. But further, libellant's counsel made clear the basis of his decision, leaving as the real crux of the case his one act of refusing the offer while it remained conditional, in order to retain the opportunity to prove the greater amount at the projected later trial. How really burdensome this claim could ever be is none too clear; apparently we are asked to assume that the bank, prepared to loan $70,000 against vessels worth more than $250,000, would advance no more. Even making this assumption we do not see how the statement of an amount as due, coupled with an expressed willingness for immediate trial as to its validity, can be a misuse of the agencies of justice. Unlike the usual precedents, we have here no attempt to avoid or prevent the effective operation of the court's protective shield. On the contrary, libellant did what it could, against respondent's opposition, to set the court processes speedily in motion. Small wonder is it, therefore, that respondent can cite no authority to support its extreme position.

Respondent has rested its appeal to us upon its claim of duress, rather than upon a claim of discretionary power in the court to revise a decree within the term. The reason is, of course, obvious. The district judge directly familiar with the facts had refused to act after a very careful re-examination of the entire case; and his decision, so far as it was discretionary, was final. The I. F. Chapman, 1 Cir., 241 F. 836, 839, certiorari denied 245 U.S. 647, 38 S.Ct. 9, 62 L.Ed. 529. Further, in our reading of the record, this was the only appropriate result. A contrary ruling would have given us concern in view of the fact that this was a decree arrived at by agreement of the parties (McArthur v. Thompson, supra, 140 Neb. 408, 299 N.W. 519, 139 A.L.R. 413), the admonition against "too ready unravelling of judgments" expressed by this court in the earlier opinion (W. E. Hedger Transp. Corp. v. Ira S. Bushey & Sons, supra, 155 F.2d 321, 324), and the well-settled rule that an error of judgment of counsel is inadequate justification for such unravelling. Mr. Justice Story in Baker v. Whiting, C. C. Me., Fed.Cas.No. 786; Merchants' Banking Co. v. Cargo of the Afton, 2 Cir., 134 F. 727, 731, certiorari denied 196 U.S. 639, 25 S.Ct. 794, 49 L.Ed. 630.

Since all the facts are now fully known, there is no occasion for a trial or for the

---

it seems remarkable that so few decisions have given this recognition to the coercive results of the seizure of assets under mesne process in civil actions"; p. 685, "In this case [sale on execution of assets really owned by a stranger] * * * no 'opportunity to litigate,' to establish immunity from seizure, will ordinarily be provided before the seizure is made. The reasons for refusing relief to the judgment debtor can scarcely apply to a stranger who is no way precluded by the judgment or subjected to its sanctions"; p. 689, "If the mortgage creditor has proposed to employ a judicial proceeding, in the form and with the sanctions specifically authorized, it seems at the outset impossible to spell out misconduct or provide relief from the pressure. If the debtor contends that the claim asserted is excessive or wholly unfounded, he may claim that his debate with the mortgagee will be conducted at a disadvantage; but this claim can be countered with the suggestion that the debate will be conducted before a court, with full opportunity to contest the creditor's claim before foreclosure can be decreed," citing many cases, including Martin v. New Rochelle Water Co., 11 App.Div. 177, 42 N.Y.S. 893, affirmed 162 N.Y. 599, 57 N.E. 1117; Pziepoira v. Long, 338 Pa. 242, 12 A.2d 904; and Pease v. Francis, 25 R.I. 226, 55 A. 686.

taking of testimony. It is as much the duty of the court to protect litigants from long and utterly useless litigation as it is to afford an opportunity for trial to those deserving it. And while a court will be astute to prevent misuse of its processes, it can hardly be expected to look with favor upon the device of obtaining postponement of effective trial by seeking a decree to be repudiated after its immediate objective has been obtained. Obviously the respondent has no such extrinsic facts to present as the Restatement refers to (such as threat of kidnapping a party's child) and has not suggested any addition it could make to its petition. The facts are all shown by the record. Accepting the motives and intent ascribed to libellant in the petition we can still find nothing illegal in its acts or erroneous in the court's grant of respondent's request for the consent decree and later refusal to vacate it.

Affirmed.

FRANK, Circuit Judge (dissenting).

1. This appeal presents, I think, the question whether a court should allow its processes to be employed abusively as coercive weapons. Were the facts as stated by my colleagues, I would agree that that question is not here. But, as I shall try to show, my colleagues reach that conclusion by disregarding what I consider pivotal facts.

While my major disagreement with my colleagues derives from differences about the facts (or their interpretation), I disagree also with several of their legal conclusions. The major items in their opinion with which I disagree are as follows: (a) They recognize no important distinction between an attack made on a decree or judgment during the term and one made thereafter. (b) They indicate that a decree or judgment will not be vacated or modified, during or after the term, on the ground that it was obtained by duress, unless the duress was the equivalent of a threat of kidnapping the defendant's child. (c) They suggest that, in particular, a consent decree will not be vacated or modified, during or after the term, on the ground that the consent was procured by duress. (d) They say that petitioner, the Hedger Company, made no tender of payment before it made the tender coupled with its consent to the decree. (e) They indicate that petitioner's counsel, before entry of the decree, admitted that a bona fide dispute existed as to whether petitioner was indebted to Bushey. (f) They give no weight to the fact that Bushey said that, unless its demands were met, it would increase its claim by $25,000. (g) They say that the petition is so defective in important respects that we must affirm its dismissal, as if on a demurrer, without remanding to permit amendment. In the course of this opinion, I shall discuss each of those points.

Including what I regard as important, omitted, facts, as they appear from the petition and record for the purposes of this appeal, the case, I think, comes to this: The holder of a preferred ship mortgage, which, to his knowledge, has been fully paid, brings suit to foreclose, wrongfully claiming that some $70,000 is still owing under the mortgage, and attaches the mortgaged vessels. Proof by the defendant mortgagor that the mortgage debt has been paid will lead to a trial lasting for several weeks. If, during those weeks, the vessels are idle because of the attachment, the defendant will suffer severe financial loss, and probably financial ruin. By giving a bond for the $70,000, defendant can obtain the release of the vessels from the attachment. The defendant offers to give such a bond, on condition that thereupon (a) not only will the attachment be dissolved but also (b) the plaintiff-mortgagee will satisfy the mortgage of record. The plaintiff rejects the second condition. The judge rules that, if a bond is given, it will release the attachment only, not the mortgage lien, and that, despite the filing of a bond, he will not direct the mortgagee to satisfy the mortgage.[1] As the plaintiff knows, the defendant's financial condition is such that defendant cannot give a bond for $70,000, or pay that sum to plaintiff, except through the aid of a certain bank. As plaintiff also knows, the bank will supply such a bond, or make an advance to enable defendant to

---

[1] Whether this was a correct ruling, I shall discuss infra.

pay the $70,000, if, but only if, simultaneously the mortgagee executes and delivers a satisfaction of the mortgage, so that the bank can have an unclouded first mortgage on the vessels as security. Defendant tenders the $70,000, and the plaintiff mortgagee at first indicates that, upon a decree for that amount and payment thereof, it will satisfy the mortgage. Subsequently, however, plaintiff refuses to execute and deliver such a satisfaction of the mortgage, unless the defendant both consents to a decree and pays the wrongful $70,000 claim. Mere payment of the $70,000, without a consent, will not cause prompt termination of the suit, thereby freeing the vessels of both the attachment and the outstanding mortgage. For plaintiff notifies defendant that unless defendant both so consents and pays, plaintiff will amend its pleadings and claim $95,000. This will mean that, to bring the suit to an end without a long trial, defendant must either (a) consent to and comply with a $70,000 decree or (b) without a consent, pay $95,000 which defendant cannot obtain. Under this pressure, defendant yields, consenting to a $70,000 decree and paying the $70,000 decreed, (borrowing the money from the bank on the security of a first mortgage on the vessels). Within the term, defendant petitions the court which entered the decree for vacation of the decree and restitution of the amount thus paid to plaintiff.

I stress the fact that the petition was filed within the term. For it has often been held that, during the term, a judge has plenary power to modify or revoke his judgment or decree, a power far more extensive than that which exists to relieve from a judgment or decree after the term, whether the relief is then sought, by bill of review or otherwise, in the same court or in another court.[2]

It is important to recall just what we decided on the former appeal. Significantly, we did *not* hold that the "complaint" was to be considered a "libel of review." Our opinion (per Judge Learned Hand), after carefully noting—155 F.2d 321 at 323—that the "complaint" had been filed during the term, said that consequently it was not necessary to resort to a "libel of review," and that the "complaint" should be deemed but "a petition in the suit," to vacate the decree within the term. We said further (page 322): "The complaint alleged that in fact nothing was due upon the mortgages, as an accounting would show; but, since the accounting would have taken a long time to state," the Hedger Company "could not afford to wait, and" was "forced to pay the demand under duress." We held that the district court had no jurisdiction with respect to Hedger individually or as to any claim for damages except restitution. Accordingly, we reversed and remanded (page 325) "with instructions to treat the complaint as a petition [by the Hedger Company] in the foreclosure suit to reopen the decree upon the grounds therein alleged, on whose sufficiency, however, we are not to be understood to pass." But we said (page 325) that the district court had jurisdiction to "direct restitution of any sum" which Bushey "may be found to have collected

[2] See, e. g., Zimmern v. United States, 298 U.S. 167, 169, 170, 56 S.Ct. 706, 80 L.Ed. 1118; Henderson v. Carbondale Coal & Coke Co., 140 U.S. 25, 40, 11 S.Ct. 691, 35 L.Ed. 332; Basset v. United States, 9 Wall. 38, 41, 19 L.Ed. 548; Bronsen v. Schulten, 104 U.S. 410, 415, 26 L.Ed. 797; Doss v. Tyack, 14 How. 297, 312, 14 L.Ed. 428; South Utah Mines v. Beaver County, 262 U.S. 325, 329, 330, 43 S.Ct. 577, 67 L.Ed. 1004; United States v. Mayer, 235 U.S. 55, 69, 35 S.Ct. 16, 59 L.Ed. 129; United States v. Benz, 282 U.S. 304, 306, 307, 51 S.Ct. 113, 75 L.Ed. 354; Wayne United Glass Co. v. Owens-Illinois Glass Co., 300 U.S. 131, 136, 137, 57 S.Ct. 382, 81 L.Ed. 557; Hazel Atlas Co. v. Hartford Co., 322 U.S. 238, 244, 64 S.Ct. 997, 88 L.Ed. 1250; Moore and Rogers, Federal Relief From Civil Judgment, 55 Yale L.J. (1946) 623, 678; 2 C.J.S., Admiralty, §§ 166, 167; Walden v. Skinner, 101 U.S. 577, 584, 25 L.Ed. 963; Fleming v. Huebsch Laundry Corp., 7 Cir., 159 F.2d 581; cf. Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 88, 42 S.Ct. 196, 66 L.Ed. 475; Safeway Stores v. Coe, 78 U.S. App.D.C. 19, 136 F.2d 771, 148 A.L.R. 782; Morse v. United States, 270 U.S. 151, 153–154, 46 S.Ct. 241, 70 L.Ed. 518; Heffern v. The De Witt Clinton, D.C., 44 F.Supp. 550; The New England, C.C.N.H., 18 Fed.Cas. pp. 54, 55, No.10,151; Jackson v. Munks, C.C.Wash., 58 F. 596, 599; Snow v. Edwards, D.C., Fed.Cas.No.13,145; The Eva D. Rose, 4 Cir., 166 F. 101, 103.

from" the Hedger Company "in excess of * * * the amount due upon the mortgage, if any"; as we otherwise put it (page 324), the district court had jurisdiction to order "restitution of any balance which, after stating the account, the court may find to have been an overpayment by the Hedger Company to the Bushey Company, extorted *by duress, or abuse of process.* * * * *"[3]

It remained, then, for the district court to pass on "the sufficiency" of the petition, *i. e.,* to determine whether petitioner made out a case of overpayment through "duress, or abuse of process" practiced by Bushey in connection with the suit. On the coming down of our mandate, the district judge proceeded thus: Before any answer to the petition had been filed, and without hearing any evidence in support of the petition's allegations, he considered parts of the face of the petition and some of the previous record in the foreclosure suit.[4] On that basis, he held that no duress or abuse of process appeared, and that the petition was therefore without merit. Accordingly, he entered an order dismissing the petition (and without leave to amend). In other words, the judge, of his own motion, acted as if defendant had demurred. As I shall point out later, dismissal, without leave to amend, on a motion to dismiss based solely on pleadings (i. e., a demurrer) is today considered most undesirable, and has always been so considered in admiralty.[5] But, assuming that the judge properly thus dealt with the petition, he was obliged, of course, to take as facts all the matters which were of record in the previous stages of the foreclosure action.[6]

2. The judge, however, was also bound to take as true all the facts alleged in the petition, except in so far as they contradicted those record facts. Consequently, for purposes of this appeal from that order, we must assume that, if permitted to do so, petitioner, the Hedger Company, would prove the uncontradicted facts so alleged. The sole issue before us, then, is whether, on that basis, there was "duress, or abuse of process."

My colleagues hold that there was not. I would agree with them if the facts we must here consider were solely the facts as stated in the majority opinion. For the facts as there stated, if summarized, disclose merely this: When Bushey instituted its foreclosure action, the Hedger Company, in its answer, alleged that there was lack of "any or adequate consideration" for the mortgage, the inadequacy (my colleagues say) being but vaguely stated; in court, before the decree was entered, Hedger's counsel conceded that there was a real dispute as to whether the amount claimed was owing to Bushey, and objected to a prompt trial; the Hedger Company, with ample opportunity to offer evidence in proof of its defense, and able meanwhile to obtain a release of its vessels by giving a bond, voluntarily refrained from doing so; instead, for reasons of its own, it deliberately chose to consent to the decree of foreclosure for the amount claimed by Bushey and paid that amount to Bushey. Patently, if such were the facts, then petitioner would not be entitled to a vacation or modification of the decree or to repayment of any part of what it paid Bushey.

3. But I read the record differently, emphasizing what I consider crucial facts which my colleagues (like the district judge) omit to mention. Of course, I may mistakenly interpret those facts. In order that, if I do, my error will be apparent, and because the petition and the colloquy between the judge and counsel (prior to the decree) are lengthy, I have set forth in an Appendix to this opinion (1) excerpts from the petition and (2) the complete record of that colloquy. For I entirely agree with my colleagues that (1) must be read in the light of (2). I believe that

---

[3] Emphasis added.

[4] I shall show infra that he excluded from his consideration many vital facts alleged in the petition and contained in the record. Cf. Fairmount Glass Works Co. v. Coal Co., 287 U.S. 474, 482, 483, 53 S.Ct. 252, 77 L.Ed. 439.

[5] Clark, Code Pleading, 2d Ed.1947, 502–503, 535–545; and see Point 7 of this opinion.

[6] My colleagues speak of "judicial notice." I doubt whether resort to such notice was necessary in order to permit the judge to consider such record matters.

the data in the Appendix discloses that the case is as I depicted it at the outset of this dissenting opinion. However, to bring out sharply my divergence from my colleagues as to the facts, I think it desirable, even at the expense of some repetition, to summarize that data in somewhat greater detail, as follows.

In its answer filed in the foreclosure action, the Hedger Company alleged these facts: Beginning in 1932, that company and Bushey engaged in a joint venture relating to the ships involved in this suit. The mortgage under foreclosure was given by the Hedger Company to Bushey in connection with transactions relating to that joint venture. Bushey, in those transactions, had so defrauded the Hedger Company that the mortgage was given for little or no consideration. As part of those transactions, the parties agreed that the primary source of payment of the mortgage was to be the earnings of the mortgaged ships. In fact, the mortgage, after it was given, had been paid in full out of those earnings and before the foreclosure action began. The payments had been made under the supervision of Provo, an officer of the Hedger Company who kept its books but who was an employee of Bushey; and they were kept by him in such a way that these payments had been concealed from the Hedger Company until a few months before the institution of Bushey's foreclosure suit. The answer therefore alleged that nothing was due from the Hedger Company to Bushey. In addition, it alleged that the Hedger Company was informed and believed that the concealed payments went beyond payment of the amount due on the mortgage, and left Bushey owing a substantial amount to the Hedger Company. Because of these very facts, the Hedger Company, some seven weeks before the foreclosure action started, had brought suit in the state court against Bushey, seeking an accounting and a large money decree.

The petition for vacation of the decree referred to the answer and further alleged the following: After the foreclosure suit was begun, Bushey claimed that the amount owing on the mortgage was $69,491.56. The Hedger Company had been prevented from proving that it owed Bushey nothing on the mortgage by the following (much of which my colleagues ignore): (1) Such proof would have required a long, complicated accounting which would have related to the many transactions, out of which the mortgage arose, that had occurred over a period of some twelve years. During that long trial, the Hedger Company's vessels would have remained idle, because they had been seized through the institution of the foreclosure suit; this prolonged inactivity of these vessels would have paralyzed the Hedger Company's business during that long trial, unless the Hedger Company could give a bond for the vessel's release or pay the amount claimed. (2) However, as Bushey knew, the Hedger Company was then in such straitened financial condition that it could not obtain a bond for $69,491.56 necessary to procure such release, or the funds to pay that amount to Bushey, otherwise than through a certain bank. That bank would not assist in supplying that bond, or in advancing that money, unless the Bushey mortgage were simultaneously cancelled (so that the bank might, as security, procure a first lien on those vessels). Consequently, as Bushey knew, the Hedger Company could not have its vessels promptly released unless Bushey would cancel the mortgage; and, as Bushey also knew, the Hedger Company's business would stop, to its grave financial loss and probable ruin, during the lengthy trial necessary (if Bushey resisted) to prove that the Hedger Company owed Bushey nothing on the mortgage. The judge ruled that, if the Hedger Company gave the required bond, the attachment would be dissolved but the mortgage lien would remain alive, and that he would not order it to be satisfied of record. The Hedger Company then tendered the $69,491.56, and at first Bushey indicated that it would satisfy the mortgage if that sum were paid pursuant to a decree therefor. But, subsequently, Bushey refused to do so unless and until the Hedger Company would both consent to a foreclosure decree for that sum, and, pursuant to that decree, pay it to Bushey. Mere payment of that sum, minus the consent, would not have terminated the suit,

thereby releasing the vessels from the attachment and the mortgage. For Bushey had notified the Hedger Company that, unless it not only paid the $69,491.56 but also consented to a decree for that amount, Bushey would amend its pleadings and claim $25,000 more. Thus, without a consent to a decree for $69,491.56, immediate release of the vessels would require the Hedger Company to pay $25,000 in addition to the $69,491.56. But the Hedger Company could not obtain this additional $25,000. It thus faced these alternatives: (a) It could, for many weeks, litigate in the foreclosure suit, proving its defense that it owed Bushey nothing; but, in that event, with its vessels tied up because it could not give a bond, the Hedger Company would suffer serious financial loss and probably ruin. (b) The only alternative which would avert that dire result was to forego a trial, consent to the decree, and pay Bushey the $69,491.56 which it demanded. The Hedger Company chose the second alternative, believing that it could not afford to await the outcome of a trial or of an appeal. By yielding, it brought about the prompt release of its vessels. It procured the money, needed to pay the unfounded claim, from the bank which, upon satisfaction of the Bushey mortgage, secured itself by a new first mortgage on the ships. In the circumstances, that choice was made under duress.[7] Bushey, in instituting and pressing its foreclosure action, intended thus to coerce the Hedger Company, in order to bar recovery by the Hedger Company in its pending state court accounting suit and to obtain this payment of money not owing from the Hedger Company to Bushey.[8] (3) The Hedger Company, having yielded to this duress, less than four weeks later, and during the term, filed its petition asking to have the decree set aside and the money restored.

4. I shall now try to show that my colleagues have misconceived the situation before us.

(a) My colleagues say that petitioner, the Hedger Company, "never made a tender" of any kind until the ultimate tender of payment of $69,491.56 which was coupled with a consent to the decree. I think the following portion of the record (see my Appendix) contradicts that statement. On March 7, 1945, just after Bushey began to put in its proof, there was a short recess, and the following then occurred:

"Mr. Tibbetts (counsel for the bank): Your Honor, I am asked to present this check again and say that the check has been prepared ready for delivery on receipt of satisfaction of the mortgages and discontinuance of this action, concurrently —that is, at the time when the new mortgage can be recorded.

"Mr. Gray: And this check is made payable to the order of Foley & Martin, attorneys for Ira S. Bushey & Sons, Inc. and is in the sum of $69,403.28. Therefore, in addition, I tender, in cash, the sum of $94.84.

"The Court: Then, we really haven't moved ahead one centimeter, have we?

"Mr. Gray: Oh, yes, your Honor.

"The Court: I think not. This is a conditional tender, that is, you will pay the money if you receive satisfaction of the mortgages.

"Mr. Gray: That condition has already been approved by the other side because they said they would take the tender and give us satisfaction of the mortgages.

"Mr. Heckman: We will give the satisfactions on an unconditional tender.

"Mr. Tibbetts: Of course, it is understood that the satisfactions are to be satisfactory to the attorneys.

"Mr. Martin: The satisfactions are right here.

"The Court: I think they should have an opportunity to examine them.

"Mr. Gray: May this check and this cash be delivered in the Customs House where it is usual to pass these papers, so

---

[7] The petition alleges further facts in aggravation of the duress, i.e., that Bushey threatened, if Hedger did not promptly pay and consent to the decree to stir up litigation against Hedger by others of Hedger's creditors and to attach Hedger's tugs, theretofore not seized, with which Hedger had been able to continue a small amount of business.

[8] I shall later discuss this part of the petition more in detail.

that there can be no intervening liens filed, and that, of course, can be done tomorrow morning.

"The Court: I don't think Mr. Heckman will stand on that kind of ceremony but do you wish to examine the satisfaction pieces in connection with the tender?

"Mr. Gray: No, sir.

"Mr. Heckman: They are all here, executed. We tender the satisfaction pieces to counsel, for his examination, being the satisfaction of the mortgage previously marked here in evidence as Libelant's Exhibit 1, being an original and a duplicate, which I understand to be a Customs House requirement, and executed by the President of Ira S. Bushey & Sons, Inc., with the corporate seal and the usual acknowledgments.

"I can state to your Honor that to secure the same indebtedness, there was a mortgage on some enrolled vessels which did not have a sufficiently high status to have a preferred mortgage and I now submit for their examination, the satisfaction of those other mortgages.

"Mr. Gray: May it be understood that the papers will be passed and the money passed to the libelant at the Customs House.

"Mr. Heckman: No, the money and the papers will pass right here. We do not want to try this case in the Customs House.

"The Court: Will you agree that the tender is kept good if the money is produced at the Customs House tomorrow morning at 9:30, so that you can exchange it then for these satisfactions?

"Mr Heckman: If, before we leave, we can agree that these papers I am showing now are to be delivered and that is all that is to be delivered.

"Mr. Martin: We cannot just discontinue the action here, the Marshal and the Clerk must be taken care of.

"Mr. Tibbetts: I want it fully understood, your Honor, as representing the lender of the new money, that we must have papers at the Customs House that will satisfy the officer in the Customs House who records the mortgages to accept this new mortgage.

"The Court: I understand that perfectly. The purpose now is for you to satisfy yourselves as to their sufficiency.

"Mr. Gray: But the man in the Customs House may not agree with us because they have certain rules that they rigidly follow.

"The Court: Mr. Heckman wants to see if he satisfies you and if he does then I think he is able to deal with the man in the Customs House.

"Mr. Gray: May we examine them now and then adjourn to the Customs House.

"Mr. Tibbetts: There are thirty-six of these documents to be gone over and certified copies made, to be put on the ships.

"Mr. Heckman: That is the new mortgage.

"Mr. Tibbetts: What difference does it make to you whether it is this afternoon or tomorrow?

"Mr. Heckman: We do not want to become involved in any disagreements between the new mortgage people and yourselves.

"Mr. Tibbetts: Well, I am not authorized to deliver any check until we know that the conditions are such than we can put our new mortgage in for recording. There is a slight amount of conforming which was delayed on account of this controversy and it certainly would not be possible to complete the recording this afternoon.

"Mr. Heckman: Well, certainly the Collector could this afternoon pass on our satisfactions, which is all we can give them.

"The Court: Why don't you see what you can accomplish this afternoon? Take an adjournment now until tomorrow morning and see what you can accomplish.

"Mr. Gray: Very well, your Honor.

"The Court: We will recess now until 10:30 o'clock tomorrow morning."

On March 8, when the hearing resumed, the following occurred:

"Mr. Gray: Your Honor, we are ready to have your Honor sign a decree under our tender of yesterday afternoon.

"The Court: As I understand it now, the satisfactions have all been recorded and filed in the Customs House?

"Mr. Gray: No, sir, the satisfactions are being held over in the Customs House, together with the mortgage. As soon as your Honor signs this consent decree then Mr. Heckman will consent to a discontinuance of the action, upon the payment of costs to the Marshal and we will then go to the Marshal's office and turn the money over.

"Mr. Heckman: That is not just it. I will ask the Court to sign this decree which provides for a recovery. I will sign this in the Marshal's office when you turn over the money.

"Mr. Gray: That is all right. Then, the Marshal has to 'phone to the Collector of the Customs so as to release the vessels and then the mortgage and the satisfactions will be duly recorded.

"The Court: All right. I am now signing the order (order signed and consent decree signed)."

In other words, in the interval between the two court sessions, petitioner had agreed to consent to the decree. How this additional fact—the consent to the decree—came about is set forth in the petition. It states that, on March 7, petitioner tendered $69,491.56 to Bushey, to be exchanged for satisfaction of the mortgage, and that the hearing was adjourned to March 8. The petition then continues thus: "The proctors for the respective parties met at said Customs House as arranged on March 8, 1945, and there were also present the attorneys for said Grace National Bank of New York with all documents prepared for recording of a preferred marine mortgage of said barges from the plaintiff corporation to said Bank, but the proctors for the said libellant arbitrarily and unlawfully declined to deliver such satisfactions to the said claimant-respondent unless and until it authorized its proctor to sign a consent to the entry of a decree in said foreclosure action for the amount of said tender. The plaintiff corporation was thus again faced with ruin if its floating equipment were not immediately released and for fear that the financial arrangements with said Bank, of which the said libellant was aware, might collapse if the further unlawful demand of the said libellant were not acceded to, and by reason of the facts hereinbefore set forth, the plaintiff corporation believed it had no other means of immediate relief from the said duress, unlawful compulsion and abuse of process perpetrated and inflicted by the defendant upon the plaintiff corporation, and it therefore unwillingly and in order to emancipate its said property from said actual and existing duress upon it by the said libellant, authorized its proctor to sign such consent and said proctor did so accordingly and said decree was signed by the Judge presiding at said trial upon such consent."

(b) The effect, under the statute, on a preferred ship mortgage lien of giving a bond is not clear. There are two possible interpretations of the statute: (1) The first is that the bond effects a release of the attachment only, and has no effect on the mortgage lien; this was the position of the judge, both before and after the decree's entry; and it was and still is the position of Bushey, as shown in its brief on this appeal.[9] (2) The second interpretation is that, upon filing of a bond, the attachment is dissolved and the judge must also direct the mortgagee to execute a satisfaction of the mortgage. I think that analysis will show that, under either interpretation, petitioner here (if the petition's allegations are true) was put under such pressure that its consent to the decree is voidable:

If it be assumed as the correct interpretation of the statute that the filing

9 There is, I think, much to be said for this interpretation. In addition to the views of the judge below, there should be considered this contention made by Bushey in its brief on this appeal: When a bond is filed, it dissolves a non-contractual lien. But, pursuant to the Preferred Ship Mortgage Act, a preferred ship mortgage creates a contractual lien on a mortgaged ship; and Congress could not have intended that the mortgagee should be compelled to take, as substituted security for its agreed lien on the ship, a claim against the sureties on a bond, as those sureties may become insolvent.

However, for reasons noted in the text, I think it not necessary in this case to choose between the two statutory interpretations.

of a bond would not require the mortgagee, Bushey, to execute a satisfaction of the mortgage, then, on the facts alleged and of record, petitioner could not give a bond, because the bank would not supply one unless simultaneously the mortgage lien was satisfied. Petitioner, to save its business, was thus forced to yield to Bushey's demand, i. e., to consent to the decree and pay the amount, not owing, which Bushey claimed.

Let it now be assumed as the correct statutory interpretation that the giving of the bond would not only dissolve the attachment but would also call on the judge to direct satisfaction of the mortgage. On that assumption, the situation here was this: Petitioner offered to give a bond if Bushey would both release the attachment and execute a satisfaction of the mortgage. Bushey refused. As we have seen, the judge then said in open court that, were petitioner to file a bond, the attachment would be dissolved, but that (as Bushey urged) the mortgage lien would remain unaffected. In other words, the judge said that, if a bond were filed, he would not direct Bushey to satisfy the mortgage. With that ruling from the judge, obviously the bank would not supply the bond; for, had it done so, the only lien it could get on the vessels would be subject to Bushey's mortgage lien, outstanding of record.

It might conceivably be argued as follows: If the second interpretation of the statute is correct, then, upon the filing of a bond, the Bushey mortgage—although the judge's refusal to order it satisfied would leave it still outstanding of record—would automatically become defunct in legal contemplation, so that the bank could get a valid first mortgage. But, even so, in the face of the judge's ruling, clearly the bank's lawyers, if at all experienced, would not be ready to advise the bank to take such a risk, especially as no court had then sanctioned the second interpretation of the statute. Moreover, as previously noted, Bushey threatened that, if petitioner did not at once consent to a decree for the

$69,491.56 and pay that sum, Bushey would increase its claim by $25,000. As already noted, this meant that, to procure prompt release of its vessels, petitioner had either (a) to consent to a $69,491.56 decree and to pay that sum, or (b) without a consent, to pay $25,000 more. But petitioner could not raise that additional amount. Thus the judge's ruling, plus Bushey's wrongful refusal to satisfy the mortgage except either (a) upon a payment under a consent decree of $69,491.56 or (b) payment without a consent decree of an additional $25,000, compelled petitioner, in order to save its business, to meet Bushey's demand. Its consent to the decree was therefore wrongfully obtained. On considering the petition to vacate the decree, the judge again held that he had, before the decree, made a correct ruling as to the effect of a bond on the mortgage lien. See 70 F.Supp. 578, 585-586. If the contrary statutory interpretation is correct, the judge was wrong. On that assumption, he should have concluded—as we now should conclude—that his ruling before entry of the decree had been in error, and that (if petitioner's allegations are true) (a) that mistaken ruling together with (b) Bushey's wrongful refusal to satisfy the mortgage (securing an unfounded claim) upon petitioner's putting up a bond for $69,491.56 or paying that amount, had forced petitioner's consent to the decree. Accordingly, the judge, on a petition filed during the term, should have held that the decree should be vacated if, upon a trial, the petition's allegations were proved.

Had the decree been entered and had petitioner paid that amount without consenting to the decree, I think there would be no doubt that, because of the judge's ruling— if erroneous as it was if the second interpretation of the statute is correct—the decree would have to be vacated. The consent would bar such rectification, had it not been coerced by Bushey's conduct. But the coercion, I think, removes that barrier.[10]

(c) Accordingly, I think the judge's dismissal of the petition was an abuse of dis-

[10] See, e.g., Doss v. Tyack, 14 How. 297, 312, 14 L.Ed. 428; Scholey v. Mumford, 60 N.Y. 498; Swift & Co. v. United States, 276 U.S. 311, 324, 48 S.Ct. 311, 72 L.Ed. 587; cf. Restatement of Restitution, §§ 70 (comment a), 71.

cretion. A reading of his opinion (70 F. Supp. 578, 587) shows that he "excluded from his consideration matters which were appropriate to a decision":[11] He based that decision on petitioner's failure to give a bond and on the assumption that "the choice at all times lay with" petitioner "to accomplish release of its vessels, and proceed to litigate." In reaching that conclusion, he did not consider or discuss the allegations that petitioner, due to its financial condition, could not obtain a bond unless the mortgage were simultaneously satisfied; nor the allegation that petitioner owed Bushey nothing; nor the effect of Bushey's threat to increase its claim by $25,000; nor the allegation that, after petitioner made a tender of the $69,491.56 unaccompanied by a consent, it was coerced into consenting to the decree.

My colleagues, however, hold either that the exercise of discretion as to such a petition is unreviewable or that here it was properly exercised. In support, they cite The I. F. Chapman, 1 Cir., 241 F. 836, 839, a case in which the facts were markedly different from those here. This appears from the court's following statement of the facts: "The claimant having had from June 25, 1914, until April 26, 1915, to prepare his evidence on the question of damages, and having closed his case May 25, 1915, without requesting further time or further hearing, could not be granted a reopening of the case for further evidence upon the grounds set forth in his motion of November 20, 1915, on the accompanying affidavits. These disclosed no excuse for the failure to make full investigation before trial, and set forth no additional evidence, except such as was merely cumula-

tive, and not such in its nature as could substantially modify the assessment based upon the evidence heard. * * * Whether or not to reopen the hearing for further evidence, upon an application first made six months after the hearing had been closed, was clearly discretionary with the court, and its action cannot be reviewed here by assignment of error."

My colleagues cite other cases which, likewise, have no resemblance to this: In Merchants' Banking Co. v. Cargo of the Afton, 2 Cir., 134 F. 727, after, on appeal, a decision in admiralty had gone against a party, the appellate court denied a motion for rehearing to introduce further evidence which had been fully known to the party at the time of the trial but which it had not then offered because of an error of judgment on the part of its counsel. In Baker v. Whiting, C.C.Me., Fed.Cas. No. 786, the court refused to open an interlocutory decree in admiralty to receive cumulative evidence of which counsel had been aware during the trial but which, through an error of judgment, he had not then offered.

My colleagues also cite state court cases [12] indicating that a consent judgment or decree is, in effect, a judicially recorded contract of the parties, and therefore peculiarly impervious to efforts at modification. Whether, under the more recent decisions, a consent decree in a federal court is merely such an agreement may well be doubted.[13] But, even so, an agreement induced by duress of one of the parties is voidable, and that is nonetheless true when it is an agreement to a decree; for the Supreme Court has held that a consent decree will be vacated for "lack of actual consent";[14] and no actual consent exists where

---

[11] Cf. Fairmount Glass Works v. Coal Co., 287 U.S. 474, 482, 483, 53 S.Ct. 252, 255, 77 L.Ed. 439 and cases there cited.

[12] McArthur v. Thompson, 140 Neb. 408, 299 N.W. 519, 139 A.L.R. 413; Annotations in 139 A.L.R. 421.

[13] United States v. Swift & Co., 286 U.S. 106, 115, 52 S.Ct. 460, 76 L.Ed. 999; cf. United States v. Radio Corporation of America, D.C.Del., 46 F.Supp. 654, 655, appeal dismissed 318 U.S. 796, 63 S.Ct. 851, 87 L.Ed. 1161; Utah P. & L. Co. v. United States, 42 F.2d 304, 308–309, 70 Ct.Cl. 391; Walden v. Skinner, 101 U.S. 577, 584, 25 L.Ed. 963; Flem-

ing v. Huebsch Laundry Corp., 7 Cir., 159 F.2d 581.

[14] See Swift & Co. v. United States, 276 U.S. 311, 324, 48 S.Ct. 311, 314, 72 L. Ed. 587. "In this court a somewhat more liberal rule has prevailed. Decrees entered by consent have been reviewed upon appeal or a bill of review where there was a claim of lack of actual consent to the decree as entered (Pacific R. R. Co. v. Ketchum, 101 U.S. 289, 295, 25 L.Ed. 932; White v. Joyce, 158 U.S. 128, 147, 15 S.Ct. 788, 39 L.Ed. 921); or fraud in its procurement (Thompson v. Maxwell Land Grant Co., 168 U.S. 451, 18

it derives from duress. ' See Griffith v. Bank of New York, 2 Cir., 147 F.2d 899; 160 A.L.R. 1340.

In Fleming v. Huebsch Laundry Corporation, 7 Cir., 159 F.2d 581, 582, the Seventh Circuit recently reversed an order rejecting a motion made, during the term, to vacate a judgment to which the defendant had consented upon erroneous representations of officials that the defendant had violated OPA Regulations. The court said that this was an instance of excusable negligence and that, while the required showing of such a fact should perhaps be more exacting in the case of a consent judgment, there was no reason why, upon a sufficient showing, it should not be vacated. The showing of coercion here is, to say the least, the equivalent of excusable negligence. The Seventh Circuit decision is in line with many decisions which have recognized that, within the term, the grounds for setting aside a decree need be far less than for doing so after the term, by bill of review or otherwise.[15] Particularly has this been held where a consent to a decree has been procured by fraud;[16] it has so been held even when the attack on the decree was made after the term.[17] And duress has been said to be a species of fraud,[18] indeed a particularly egregious kind.[19]

Had petitioner, after the term, filed a libel of review seeking vacation of the decree because of fraud (consisting of duress), the judge's abuse of discretion in dismissing the petition would be reviewed and his order reversed. Hazel-Atlas Co. v. Hartford Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250. It would be strange if this court's authority to review and reverse were less because petitioner acted within the term.[20] It would be even more strange to hold that the judge's order is non-reviewable but that, if petitioner now, after the term, refiled its petition (so that it would become a libel of review) and the judge again ordered it dismissed, that order would be subject to review. At any rate, petitioner should not be penalized for its promptness, and, if necessary, we should treat the petition as a libel of review filed within the term.[21]

(d) I think my colleagues err when they state that "apparently we are asked to assume that the bank, prepared to loan $70,000 against vessels worth more than $250,000, would advance no more." We are not asked so to assume. As previously noted, the bank would lend the money nec-

S.Ct. 121, 42 L.Ed. 539) * * *." Cf. Harding v. Harding, 198 U.S. 317, 335, 25 S.Ct. 679, 49 L.Ed. 1066.

[15] See cases cited in footnote 2, supra.
[16] Doss v. Tyack, 14 How. 297, 312, 14 L.Ed. 428.
[17] Swift & Co. v. United States, 276 U.S. 311, 324, 48 S.Ct. 311, 72 L.Ed. 587; 34 C.J. 419, 49 C.J.S., Judgments, § 330.
[18] City Nat. Bank v. Kusworm, 91 Wis. 166, 64 N.W. 843, 845; Hodge v. Wallace, 129 Wis. 84, 108 N.W. 212, 215, 116 Am.St.Rep. 938; Neibuhr v. Gage, 99 Minn. 149, 108 N.W. 884, 887, 109 N. W. 1; Smith v. Blakesburg Savings Bank, 182 Iowa 1190, 164 N.W. 762, 764; Brainard v. Van Dyke, 71 Vt. 359. 45 A. 758, 760; cf. Restatement of Restitution, § 70, comment a; § 128, comment d.
[19] Hodge v. Wallace, 129 Wis. 84, 108 N.W. 212, 215, 116 Am.St.Rep. 938; City Natl. Bank v. Kusworm, supra; cf. Cohen v. Randall, 2 Cir., 137 F.2d 441, 445.

That relief will be granted after the term, by a libel of review, where a decree has been procured by fraud or the like, see, e.g., Hall v. Chisholm, 6 Cir.,

117 F. 807, 809; Jackson v. Munks, C. C.Wash., 58 F. 596, 599, affirmed Munks v. Jackson, 9 Cir., 66 F. 571, 572; Northwestern Car Co. v. Hopkins, Fed.Cas.No. 10,334.

[20] Cf. as to abuse of discretion, Mohonk Realty Corporation v. Wise Shoe Stores, 2 Cir., 111 F.2d 287, 289.

Even in a jury case, a denial of a motion for new trial, timely made, is reviewable and will be reversed where the trial judge abused his discretion. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917; Fairmount Glass Works v. Coal Co., 287 U.S. 474, 483, 53 S.Ct. 252, 77 L.Ed. 439; Ogden v. United States, 3 Cir., 112 F. 523; United Press Associations v. National Newspapers Association, 8 Cir., 254 F. 284, 285; Glenwood Irr. Co. v. Vallery, 8 Cir., 248 F. 483, 485; cf. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 254, 61 S.Ct. 189, 85 L.Ed. 147; Cone v. West Virginia Paper · Co., 330 U.S. 212, 218, 67 S.Ct. 752. A fortiori is that true in a non-jury case, as here.

[21] Cf. Kaw Valley Drainage Dist. v. Union Pac. R. Co., 8 Cir., 163 F. 836.

essary to enable petitioner to obtain a bond, only if the bank could obtain a first lien on the vessels for the amount of the bond. That petitioner believed the ships to be worth more than $250,000 is no indication that the bank, so believed. That the bank was willing to take a first mortgage on vessels the value of which was sufficient, in the opinion of the bank, to secure it, of course does not mean that the bank regarded the security as ample to protect it on a second mortgage.

(e) My colleagues depict petitioner as having objected to being forced into a prompt trial, and as, indeed, trying to avoid or delay a trial. But petitioner's position was not at all that of objecting to a prompt trial. It urged that any trial, no matter how prompt, would necessarily last for many weeks during which its vessels would be idle, because it could not obtain a bond.

(f) My colleagues say that in our opinion on the former appeal we held that relief for unjust enrichment was not available under this petition. I think we held exactly the contrary; for we said that, if petitioner showed duress or abuse of process, it should receive restitution of any overpayment of the amount (if any) owing on the mortgage; and restitution of that kind is granted precisely because of unjust enrichment. See Restatement of Restitution, pp. 1, 2, §§ 1, 70, 71, 72, 74.

(g) Perhaps I misunderstand my colleagues, but they seem to me to say that the decree, even if not vacated or modified, may perhaps have no effect on petitioner's claims in its state court accounting action against Bushey.[22] Surely there can be no doubt on that score. As I have said, the petition states [23] that, in that accounting suit, petitioner claims (1) that, because of transactions between Bushey and petitioner concerning the mortgaged vessels, the mortgage was given without consideration, or, in any event, was paid out of the earnings of those vessels, and (2) that, in addition, Bushey wrongfully took further amounts of those earnings, so that Bushey

is indebted to petitioner. Since the decree here is an adjudication that, at the time of its entry, petitioner was indebted on that mortgage to Bushey, the decree will be a bar to a suit in which petitioner asserts that, at the time of the decree, Bushey owed something to petitioner as a result of the very same transactions.

Repeatedly, before the decree's entry, petitioner's counsel said to the judge (see the Appendix hereto) that one of Bushey's purposes was to obtain a judgment against petitioner which Bushey would then plead as res judicata in the state court suit. It should also be noted that my colleagues' present decision will preclude any later attack on the decree, in any court, based on a charge of duress.

(h) My colleagues seem to suggest that, before the decree, Bushey's position was merely this: It offered to satisfy the mortgage, as well as to release the attachment, if only a bond were given in amount larger than that necessary to cover the amount (some $70,000) which Bushey originally claimed.

That suggestion of my colleagues is, I think, wholly mistaken. As will appear from the court-room colloquy printed in full in the Appendix, Bushey refused unequivocally to execute a satisfaction of the mortgage (i. e., to do more than release the attachment) no matter what the amount of the bond. Bushey said it would satisfy the mortgage only if petitioner paid the $70,000 unconditionally and consented to the decree.

(i) My colleagues seem to say that, in the court-room colloquy before the decree's entry, petitioner's counsel virtually admitted that there was a real dispute as to whether petitioner did or did not owe anything to Bushey. That I think is not in accord with the record, which (see the Appendix) shows the following: Counsel for the Hedger Company, in explaining its defense, told the judge that his client had been defrauded into giving the mortgage without consideration. The judge then asked, "What do you conceive the issues to

---

[22] I refer to my colleagues' statement that it "is not for us to attempt to say" how far petitioner's consent to the decree "may permanently prejudice its further claim in is pending state-court action."

[23] See Appendix to this opinion.

be in this action, Mr. Gray?" Counsel answered, "The action here is lack of consideration and, if there was any consideration—first that there is no debt covered by these notes, and secondly, if there was, it has been paid." The judge then said, "In other words, you claim the amount said to be due is not due." Counsel then responded, "That's right." As my colleagues correctly maintain, the petition must be read in the light of what happened in court before entry of the decree. Thus read, I do not see how there can be any question that petitioner's position, both before decree and in its petition, was and is that it owed Bushey nothing at all on the mortgage or otherwise.

In suggesting the contrary—in saying that petitioner's position was that it did not know "the exact amount" owing, one way or the other— my colleagues, I think, confuse (a) petitioner's position as to what it owed Bushey with (b) its position as to what Bushey owed it. Only as to the latter did petitioner express lack of exact knowledge. But that want of knowledge as to Bushey's debt to petitioner cannot affect its assertion (which on this appeal we must accept as true) that it had no debt to Bushey.

Nor did petitioner claim that this absence of debt to Bushey derived from some right of set-off or counterclaim. It maintained that the mortgage debt (if any there ever was) had been paid out of the earnings of the very mortgaged vessels which, under the joint venture, were to be the primary source of such payment.

5. I do not agree with my colleagues' statement that, "since all the facts are now fully known, there is no occasion for a trial or the taking of testimony." We do not now know whether or not all the facts alleged in the Hedger petition are true, i.e., inter alia, that to Bushey's knowledge, Hedger owed Bushey nothing when Bushey instituted foreclosure; that a hearing in the foreclosure action necessary to show that fact would have taken many weeks; that, during those weeks, Hedger, to Bushey's knowledge, would have sustained heavy losses.

6. Of course, I do not say that those facts are true. All my remarks about them must be read as if in the subjunctive mood.[24] I do think that petitioner should be afforded the opportunity at a trial to prove those facts. If those are the facts, then I think there was duress or abuse of process, entitling the Hedger Company to have the decree set aside (or modified) and to an order for repayment of the $69,491.56 (or such part of it as was not owing to Bushey). In many cases, the courts have decided that tactics like those of Bushey, as described in the petition, constitute duress or abuse of process, and that one who, under such pressure, pays money which he does not owe is entitled to restitution. That he has paid the money pursuant to a judgment is immaterial if the judgment was obtained by such coercive measures. As many courts have held, his conduct is in no real sense voluntary; he has not, in the exercise of a free judgment, abandoned the opportunity to litigate, since his choice was not free but unlawfully constrained, and the coercion has prevented him from litigating his defense.

7. My colleagues, however, characterize the petition's allegations as "vague" and "hesitant," a suggestion I think I have already answered. But they seem to say that, in particular, the petition does not allege with sufficient clarity Bushey's knowledge that its claim was unfounded. I disagree, for these reasons:

(a) The petition alleges that Provo, petitioner's officer but Bushey's employee, had caused the mortgage to be paid in full out of the ships' earnings, but that he concealed that payment from petitioner. Accordingly, Bushey, through Provo, knew of that payment.

(b) As I have said, the petition clearly states that Bushey's aim in starting and pressing the foreclosure was, by duress, knowingly to destroy petitioner's accounting action. Since the purpose of the accounting action was to compel Bushey to pay money to petitioner because of the very transaction out of which the mortgage arose, it seems to me plainly to follow

---

[24] See Phelan v. Middle States Oil Corp., 2 Cir., 154 F.2d 978, 991.

that petitioner necessarily was asserting that Bushey, in trying knowingly by coercion to kill off the accounting action, was seeking in the foreclosure action by coercion to collect money it knew was not owing to it.

But, even if the petition were somewhat vague, nevertheless to sustain its dismissal, without hearing evidence and on a demurrer, is flatly inconsistent with several of our recent decisions in which we have held pleadings sufficient (on demurrer or motion to dismiss) which were far less clear in their allegations.[25] In addition, the case presented by the petition is at least clear enough so that our own precedents (and the views of the procedural reformers who were instrumental in procuring the adoption of the present procedural Civil Rules, 28 U.S.C.A. following section 723c) require the conclusion that, at a maximum, we should send the petition back to the district court in order to permit petitioner to amend it. To dismiss on a demurrer is a practice now generally regarded (except in extreme cases) as undesirable, "a glorification * * * of mere form." [26] Where that practice has been adopted by a trial court, we have held that, unless the dismissed pleading wholly lacks any suggestion of a valid claim, we will, at the least, remand with an opportunity to amend.[27] Especially is that the rule in admiralty.[28]

8. In most of the cases cited and discussed by my colleagues, the attempted attack on a decree was made after the term, and, in many, in another court. But, even in such cases, it has been held that coercion justifies equitable relief from a judgment or decree.

Significant here is our recent decision in Griffith v. Bank of New York, 2 Cir., 147 F.2d 899, 900, 160 A.L.R. 1340. There we reversed a judgment dismissing a complaint (on a "demurrer") for failure to state a claim for relief. The complaint sought to attack, in the federal court, a consent judgment obtained in a state court by duress consisting of (a) the withholding of property belonging to the complainant, (b) the "initiation of unnecessary and expensive litigation," and (c) threatened additional "unfair and oppressive expense of litigation." We said that "the case differs little, if at all, from those where a witness is forcibly prevented from testifying, or an attorney is bribed to fight a losing battle or give his client false advice." After noting the voidability of a release or consent induced by coercion or fraud, we added: "There seems no reason for a different result when the consent or release has led to the further step of a judgment." In support of that statement, we cited, inter alia, Byrnes v. Owen, 243 N. Y. 211, 217, 153 N.E. 51; Ross v. Preston,

[25] See, e.g., Levenson v. B. & M. Furniture Co., 2 Cir., 120 F.2d 1009; Dioguardi v. Durning, 2 Cir., 139 F.2d 774; Truth Seeker Co. v. Durning, 2 Cir., 147 F.2d 54. See also Kohler v. Jacobs, 5 Cir., 138 F.2d 440, 443; Clark, Code Pleading, 2d Ed.1947, 260–264.

[26] See, e.g., Clark, Simplified Pleading, 2 F.R.D. 456 at 465, 466; Clark, Code Pleading, 2d Ed. 1947, 502–503, 535–545.

[27] Downey v. Palmer, 2 Cir., 114 F.2d 116, 117; Rossiter v. Vogel, 2 Cir., 134 F.2d 908, 912; Cohen v. Randall, 2 Cir., 137 F.2d 441 at 444; Hughes v. Roosevelt, 2 Cir., 107 F.2d 901, 903; Fyfe v. Pan Atlantic S. S. Corp., 2 Cir., 114 F. 2d 72, 75; The S. S. Nea Hellis, 2 Cir., 116 F.2d 803, 804.

[28] See, e.g., The Adeline, 9 Cranch 244, 284, 3 L.Ed. 719; The Divina Pastora, 4 Wheat. 52, 64–65, 4 L.Ed. 512; Hughes v. Roosevelt, 2 Cir., 107 F.2d 901, 903; Fyfe v. Pan-Atlantic S. S. Corp., 2 Cir., 114 F.2d 72, 75; 2 Benedict, Admiralty, 6th Ed. § 355.

Admiralty has always been more liberal in the matter of pleadings than the common law. See, e. g., The Samuel, 1 Wheat. 9, 14–15, 4 L.Ed. 23; The Merino, 9 Wheat. 391, 400, 6 L.Ed. 118; The Palmyra, 12 Wheat. 1, 13–14, 6 L.Ed. 531; The Gazelle, 128 U.S. 474, 487, 9 S.Ct. 139, 32 L.Ed. 496; The Spica, 2 Cir., 289 F. 436, 440; Smith, Kirkpatrick & Co. v. Colombian S. S. Co., 5 Cir., 88 F.2d 392, 395; United States v. Porto Rico Fruit Union, 1 Cir., 12 F.2d 961, 962; Galatis v. Galatis, 5 Cir., 55 F.2d 571, 572; 2 Benedict, Admiralty, 6th Ed. §§ 223 and 255.

The Admiralty Rules, as judicially construed, anticipated in many respects the "new" Civil Rules as to liberality in dealing with pleadings. See, e.g., Colonial Sand & Stone Co. v. Muscelli, 2 Cir., 151 F.2d 884, 885; Fyfe v. Pan-Atlantic S. S. Corp., 2 Cir., 114 F.2d 72, 75; 2 Benedict, Admiralty, 6th Ed. § 223.

292 N.Y. 433, 437, 55 N.E.2d 490; Verplanck v. Van Buren, 76 N.Y. 247.[29] What my colleagues say of the Hedger Company could as well have been said of the coerced plaintiff in the Griffith case, i. e., that she had had the opportunity to litigate but chose to consent to the judgment, that she had "run away from the court," instead of "toward it." But in the Griffith case, we rejected such an argument.

9. There is perhaps, however, an intimation in my colleagues' opinion that here (as distinguished from the Griffith case) if there was duress, it was "intrinsic," not "extrinsic," since it resulted from pressures exerted, not out of court, but in and by the very suit in which the judgment was procured, and that such "intrinsic" duress (like "intrinsic" fraud of a less pronounced character) may not properly be the basis of relief. Assuming arguendo the soundness of a distinction between "intrinsic" and "extrinsic" duress,[30] I think it irrelevant here. For, to repeat, this is not a case of an attack in another court or in the same court after the term. If the facts alleged are true, it is difficult to see how petitioner could do more than it did to attain restitution: (1) Under wrongful compulsion, it consented to the decree and paid the sum decreed; (2) promptly, within the term, it petitioned to vacate the decree on account of the duress; (3) when the petition was dismissed, it took a timely appeal. True, ordinarily a consent to a judgment amounts to a waiver of appeal;[31] but that cannot be true when the consent is coerced.

10. I repeat that, even when the coerced party does not make an attack on a judgment in the same court and during the term, he may have restitution. This has often been held in connection with attachments. The following cases are typical: Chandler v. Sanger, 114 Mass. 364, 19 Am.Rep. 367 (attachment when alleged creditor knew nothing owing; recovery of money paid to discharge attachment). Spaids v. Barrett, 57 Ill. 289, 11 Am.Rep. 10 ($1000 actually due; attachment proceedings alleging $3000 due to creditor who knew this was untrue; attachment of $5000 of oysters; damages recoverable). Saliem v. Glovsky, 132 Me. 402, 172 A. 4 (attachment of about $1000 of perishable goods and fixtures for a debt known to be $33; damages recoverable). Zinn v. Rice, 154 Mass. 1, 27 N.E. 772, 12 L.R.A. 288 ($4522 due; creditor falsely alleged $40,000 due and attached $100,000 worth of goods, damages recoverable). Savage v. Brewer, 33 Mass. 453, 28 Am.Dec. 255 (attachment alleging $1500 due; vessel worth $2000 seized; actual debt, as known to creditor, only $12.00; damages recoverable); Clark v. Pearce, 80 Tex. 146, 15 S.W. 787 (recovery of money paid for release of attachment levied when creditor knew nothing due). Carpenter v. Gooley, 176 Wash. 67, 28 P.2d 264 (garnishment when creditor knew nothing due; successful action to recover money paid).

Williston, Contracts, Rev.Ed.1937, § 107 says: "Means in themselves lawful must not be so oppressively used as to amount to an abuse of legal remedies. Though attachment is in itself lawful, if an attachment is excessive, or of perishable property, or is made under circumstances which make it difficult for the defendant to avoid yielding to any demands, the use of the attachment for the purpose of enforcing extortionate or collateral demands is abusive, and transactions coerced by such means are voidable." See also §§ 1617, 1618, 1620. In many of the attachment cases, the coerced party yielded to the unfounded claim without entry of judgment in the attachment action; but, as we said in Griffith v. Bank of New York, supra, a coerced judgment interposes no added obstacle in such a case.

---

[29] Cf. Scholey v. Mumford, 60 N.Y. 498.

[30] That even as to fraud the distinction is becoming somewhat blurred, see, e.g., Griffith v. Bank of New York, 2 Cir., 147 F.2d 899 at 901, 160 A.L.R. 1340; Publicker v. Shallcross, 3 Cir., 106 F.2d 949, 952, 126 A.L.R. 386; Hazel-Atlas Co. v. Hartford Co., 322 U.S. 238, 64 S. Ct. 997, 88 L.Ed. 1250; Moore and Rogers, Federal Relief From A Civil Judgment, 55 Yale L.J. (1946) 623, 658–659; 3 Moore, Federal Practice, 3268–3269.

[31] Swift & Co. v. United States, 276 U.S. 311, 327, 48 S.Ct. 311, 72 L.Ed. 587.

The several Restatements I think are in accord with my views. See Restatement of Restitution, § 71(1) (a): "A person who has conferred a benefit upon another in response to the institution or other threat of civil proceedings against him by the other (a) is entitled to restitution if the proceedings were threatened, instituted or continued by the other without probable cause and with no belief in the existence of the cause of action or if accompanied by means constituting duress." See also § 70.

Restatement of Contracts, § 492, Comment g: "Acts or threats cannot constitute duress unless they are wrongful, even though they exert such pressure as to preclude the exercise of free judgment. But *  *  * acts that involve an abuse of legal remedies or that are wrongful in a moral sense, if made use of as a means of causing fear, vitiate a transaction induced by that fear, though they may not in themselves be legal wrongs." Restatement of Contracts, § 493: "Duress may be exercised by *  *  * (d) threats of wrongfully destroying, injuring, seizing or withholding land or other things.  *  *  * Illustrations of Clause (d):  *  *  * Illustration 14. A has a valid execution issued on a judgment against B. A threatens B that unless B gives him a mortgage the execution will be levied on B's household furniture during the wedding reception of B's daughter. B gives him the mortgage induced by fear that A will carry out his threat. There is duress." [32]

Restatement of Judgments, § 121: "Subject to general equitable considerations (§§ 127-130), equitable relief from a valid judgment will be granted to a party to the action injured thereby if the judgment was based upon a fraudulent claim or defense which he did not contest because he was *  *  * (b) prevented by duress from contesting it." My colleagues, referring to this section, cite Illustration 6, where the duress was a threat to kidnap the defendant's child. They pass by Illustration 7 which reads: "A brings suit against B upon a valid claim for $10,000. B threatens to cause A's business premises

---

[32] See also Joannin v. Ogilvie, 49 Minn. 564, 52 N.W. 217, 16 L.R.A. 376, 32 Am.St.Rep. 581 (mechanic's lien filed against plaintiff's land; claims conceded to be unfounded; lien prevented plaintiff obtaining needed loan; amount paid for discharge of lien held recoverable); Ezmirlian v. Otto, 139 Cal.App. 486, 34 P.2d 774 (recordation by defendant of oil lease, apparently valid, but known to defendant not to be so; this blocked a sale; money paid in order to free land for sale held recoverable); Ramp Buildings Corp. v. Northwest Bldg. Co., 164 Wash. 603, 4 P.2d 507, 79 A.L.R. 651 (patentee, under valid patent, threatened suit and thereby induced mortgagee to withhold advancements until mortgagor, faced with ruin, executed license and made payments to patentee thereunder); Kilpatrick v. Germania Life Ins. Co., 183 N.Y. 163, 75 N.E. 1124, 2 L.R.A.,N.S., 574, 111 Am.St.Rep. 722 (mortgagor, to avoid loss, needed to obtain a loan, necessitating release of an existing mortgage; mortgagee refused release unless mortgagor paid more than was due; excess payment held recoverable); Blair v. Maxbass Security Bank of Maxbass, 44 N.D. 12, 176 N.W. 98 (foreclosure of chattel mortgage claiming $2,137.64, when, as creditor knew, only $465.64 due; goods seized; in the foreclosure action, judgment for the smaller amount, which debtor paid; held, he could recover damages for abuse of process); see also Clinton v. Strong, 9 Johns, N.Y., 370; McPherson v. Cox, 86 N.Y. 472; Scholey v. Mumford, 60 N.Y. 498; Tamblyn v. Johnston, 8 Cir., 126 F. 267.

Cf. Restatement of Torts, § 682: "Abuse of Process. General Principle. One who uses a legal process, whether criminal or civil, against another to accomplish a purpose for which it is not designed is liable to the other for the pecuniary loss caused thereby. Comment: a. The gravamen of the misconduct for which the liability stated in this Section is imposed is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish. Therefore, it is immaterial that the proceedings which were brought with probable cause and for a proper purpose or even that the proceedings terminated in favor of the person instituting or initiating them. The subsequent misuse of the process, though properly obtained, constitutes the misconduct for which the liability is imposed under the rule stated in this Section."

to be destroyed if A does not consent to have final judgment entered for B. Five years later, when the risk from the duress is removed and when it is too late to have other relief, A seeks an order requiring B to have the judgment vacated and the case to stand for trial, or, in the alternative, to have B pay the amount due. He is entitled to this." The illustration is unmistakably of duress of property, as here. A threat (suit as that in the instant case) of destroying a man's business by means of legal proceedings involves fully as much duress as the violent destruction of his business premises. The "general equitable considerations" enumerated in §§ 127-130 include nothing adverse to the Hedger Company's position, as it now appears on this appeal. Thus § 129 bars relief if the party seeking it "failed to use due care to protect his interests"; of course, the Hedger Company, being under duress, did not fail in that respect. § 129(b) deals with failure "promptly to seek redress"; petitioner here sought redress within less than a month.[33]

My colleagues seem to say that no duress short of something like a threat of kidnapping a child will ground relief from a judgment. But this court has recently recognized that other far less drastic sorts of duress will support an attack on (or an action for relief from) a judgment entered by a court of another jurisdiction. Griffith v. Bank of New York, 2 Cir., 147 F.2d 899, 160 A.L.R. 1340.[34] A fortiori must this be true of a direct attack, as here, in the very court which rendered the judgment and before the expiration of the term.

There remains for discussion a group of cases cited by my colleagues which are, I think, not at all in point, quite aside from the fact that each of them relates to an attack on a judgment made after the term or in another court. Some deal with laches as a defense to a proceeding to set aside a judgment,[35] but, as I have noted, there was no lack of diligence here. Other cited cases say that the required duress must have been exerted by the person against whom relief is sought;[36] that is the case here. Still others relate to situations where defendants, not faced with any financial distress if they awaited the outcome of trial of their defenses, chose to refrain from doing so;[37] clearly that is not the case here.

11. I think the fundamental fallacy in my colleagues' reasoning is this: They say, in effect, that petitioner can have no relief because in the foreclosure action it made the choice, founded on its views of its own self-interest, of not offering evidence in support of its defense, and of consenting to the judgment. But to designate petitioner's conduct as a choice begs the question. As Mr. Justice Holmes said for the Court in Union Pacific R. Co. v. Public Service Commission, 248 U.S. 67, 70, 39 S.Ct. 24, 25, 63 L.Ed. 131: "It is always for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly

---

[33] Nothing in § 126 has any bearing here.

[34] See Cohen v. Randall, 2 Cir., 137 F.2d 441, 445, where it was said that coercion and duress would be sufficient to justify challenging a foreign decree, even when fraud would be insufficient. Among cases we there cited, see Burton v. Burton, 176 Okl. 494, 56 P.2d 385, 104 A.L.R. 728, and annotation at 735 (threat by husband that he would turn wife out of home without money, property or support constituted duress); Lake v. Lake, 124 App.Div. 89, 108 N.Y.S. 964 (threat of husband to abandon wife and child justified setting aside divorce decree); Hall v. Hall, 70 Mont. 460, 226 P. 469 (representations by husband that he was insolvent, that he had wrongfully disposed of securities, that a lucrative job whereby he could redeem securities and support wife and children was open to him only as a single man, and that he would remarry his wife in two years, held coercion).

[35] Brown v. Buena Vista County, 95 U.S. 157, 24 L.Ed. 422; Chase National Bank v. City of Norwalk, 291 U.S. 431, 440–441, 54 S.Ct. 475, 78 L.Ed. 894; Martin v. New Rochelle Water Co., 11 App.Div. 177, 42 N.Y.S. 893.

[36] Radich v. Hutchins, 95 U.S. 210, 213, 24 L.Ed. 409.

[37] Pickford v. Talbott, 225 U.S. 651, 661–662, 45 S.Ct. 96, 69 L.Ed. 469; Pease v. Francis, 25 R.I. 226, 55 A. 686; Pziepoira v. Long, 338 Pa. 242, 12 A.2d 904

so called." In Lonergan v. Buford, 148 U.S. 581, 590, 13 S.Ct. 684, 687, 37 L.Ed. 569, the Court said: "The plaintiffs had already paid $175,500, and without payment of the balance they could not get possession of the property, and it might be exposed to great loss unless properly cared for during the winter season. Under those circumstances, we think the payment was one under duress. It was apparently the only way in which possession could be obtained, except at the end of a lawsuit, and in the meantime the property was in danger of loss or destruction."

Their neglect of the coerced character of petitioner's choice in the instant case perhaps explains my colleagues' selection of what I consider inapposite portions of Dawson's article, Duress Through Civil Litigation, 45 Mich.L.Rev. (1947) 571, 679. Thus they quote a passage (p. 689) where Dawson discusses a case in which, in a mortgage foreclosure based on an excessive or unfounded claim, the defendant has "full opportunity to contest the creditor's claim before foreclosure can be decreed." However, in the succeeding paragraph (p. 690) Dawson says: "But the 'opportunity to litigate' provides an incomplete answer where the circumstances of the mortgagor require immediate relief from the pressure and the invalidity of the mortgagee's claim cannot be established without inevitable delay." Dawson states (pp. 690, 691) that, in such a case, relief should be granted the mortgagee who yields under such pressure. He notes that some courts have denied and others have accorded such relief. The whole tenor of his article (which cites many of the cases I have cited above) is in favor of decisions of the latter kind. Undeniably, at one time the doctrine of duress had narrow confines.[38] But, as Dawson shows, increasingly the courts have widened it, to prevent unjust enrichment as a consequence of "duress by litigation."

12. The ruling of the majority here will create, I think, a most unfortunate precedent which will permit one who thus uses litigation coercively to be unjustly enriched at the expense of his coerced victim. It ought, I think, to be the highest obligation of the courts to see to it that legal proceedings are not abusively exploited to deprive citizens of their rights.[39] There is much discussion today, and justifiably, of the dangers to civil liberties through improper uses of power by executive and legislative agencies of government.[40] With such misbehavior by such agencies, the courts often, for a variety of reasons, cannot cope effectively, in which event rectification must be left to the electorate. But the courts can far more readily and expeditiously deal with abuses of court processes. Such abuses, occurring in their very own domain, should be a matter of lively and anxious concern to judges (especially those appointed for life and thus insulated from a critical electorate). By keeping their own house in order, judges will set an example to other governmental officers.

It is unimaginative for judges or anyone else to regard the loss of civil liberties as confined to the direct loss of physical freedom or of free speech (or the like). For, if, in our kind of society, a man, coerced into submission to a false claim in a lawsuit, is deprived of his property or savings, he and his family may find themselves in such an impoverished condition that their legal freedoms—to move physically or to speak their minds—may dry up into pure formalities devoid of all practical reality. I recall a "small" businessman, caught in the toils of the depression, who, in 1933, after listening to an eloquent address on liberty, sagely remarked, "Yes, but you can't make a sandwich out of liberty." To be sure, the purely "economic man" is a bestial concept. Things of the spirit (such as civil liberties and what they make possible) are, or should be, more precious than material things. Yet for most mortals

---

[38] See, e.g., Williston, Contracts, Rev. Ed. 1937, § 1617.

[39] See Hazel-Atlas Co. v. Hartford Co., 322 U.S. 238, 244, 245, 248, 249, 64 S. Ct. 1281, 88 L.Ed. 1596.

[40] My own cordial dislike of such behavior is, I think, reasonably obvious. See, e.g., Goldman v. American Dealers Service, 2 Cir., 135 F.2d 398; dissenting opinion in United States v. Antonelli Fireworks Co., 2 Cir., 155 F.2d 631, 642. 661–664.

the former can have little value in the complete absence of the latter.[41]

## Appendix

### 1. Excerpts from Some Allegations of the Petition

The petition states that, in its answer to the libel in the foreclosure action, the Hedger Company had "pleaded the defenses of payment and lack of any adequate consideration for the said alleged mortgaged indebtedness and demanded an accounting."

The petition further alleged that "upon information and belief, at the time of the seizure of the barges," Bushey "was indebted to" the Hedger Company, "the exact amount of which indebtedness is not known to" petitioner. The reasons for making this allegation on information and belief, and for not knowing the exact amount *owing from Bushey to Hedger,* are stated in detail in twenty paragraphs of the petition, the most important part of which may be briefly summarized thus:

As the result of a joint venture, begun in 1932, the Hedger Company operated vessels owned by Bushey and subject to a large mortgage debt to a corporation known as C. I. T. By agreement of Hedger and Bushey, Bushey was to select one of its own employees to serve as the Secretary and Treasurer of the Hedger Company. One Provo, a Bushey employee, was accordingly made Secretary and Treasurer of the Hedger Company and was put in control of its books. The C. I. T. debt was subsequently paid out of the Hedger Company's earnings. Then, pursuant to agreement, the vessels were to be conveyed to the Hedger Company. But Bushey claimed that large sums were due it for repairs. As a result, the Hedger Company took title to the vessels, but subject to a $600,000 mortgage debt to Bushey. Provo, however, had concealed from Hedger and the Hedger Company the fact that, out of the earnings, this debt and more had been paid to Bushey. When, on November 4, 1944, Provo resigned as officer of the Hedger Company, its financial records were found defective and did not show the actual payments to Bushey.

Because of these facts, the Hedger Company, a few weeks later, in December 1944, and some seven weeks before Bushey began the foreclosure action, had brought an accounting action in the New York courts against Bushey, in which action the Hedger Company claimed that Bushey owed a large amount to the Hedger Company.

When, in February 1945, Bushey began its foreclosure suit—which caused the vessels to be seized under process—it "well knew and intended that the business of the plaintiff corporation would be seriously injured and damaged * * * and intended thereby to compel" withdrawal of the accounting action. The Hedger Company informed Bushey that, if its vessels were not promptly released, Hedger "would face serious loss and probably ruin." Bushey knew that the Hedger Company could not obtain the necessary bond (required to release the vessels) which the Hedger Company hoped to obtain through a certain bank, unless the mortgage was satisfied, since only thus could the bank secure itself by a first lien on the vessels. The seizure of the vessels was "oppressive and an abuse of process resorted to for the purpose of forcing" Hedger and the Hedger Company "to abandon their said action for accounting."

The defense of the foreclosure action would have involved "a long trial with a complicated accounting between the plaintiff corporation and the defendant covering a period of at least twelve years and

---

[41] It will not do to be misled by the word "spiritual" when used in scornful contrast with "material." That device the fascists skillfully employ. Mussolini said in 1932: "Fascism * * * believes in holiness and heroism, that is to say in actions influenced by no economic motive, direct or indirect. * * * Fascism denies the materialist conception of happiness as a possibility * * * and denies the validity of the equation—well-being-happiness—which would reduce men to the level of animals, caring for one thing only—to be fat and well fed—and would thus degrade humanity to a purely physical level." See Frank, Fate and Freedom (1945), 215, 216.

involving innumerable transactions * * * during which the corporation would have been utterly ruined through its ability to operate the barges under seizure. * * *"

"Subsequent to the seizure of said barges and prior to the 20th day of February, 1945, the plaintiff corporation proceeded to arrange for the filing of a stipulation for value in said mortgage foreclosure action for the purpose of releasing said floating equipment from the custody of the Marshal so that the business of the plaintiff corporation might continue, and on the 20th day of February, 1945, ascertained from the proctors for said libellant (the defendant herein) that a stipulation for the sum demanded in said libel, to wit: $73,766.66, would be sufficient in amount, but the said libellant (this defendant) refused to deliver to the claimant-respondent upon the filing of a stipulation for value in the amount demanded in said libel satisfactions of all the aforesaid mortgages secured upon the floating equipment of the plaintiff corporation which had been given to secure the alleged indebtedness sought to be collected in said foreclosure action; although the defendant well knew that such refusal was improper and would hinder and impede the plaintiff corporation in obtaining and filing a stipulation for value as demanded and in securing the release of said barges from the existing attachment.

"The seizure of said floating equipment under said process reduced the available fleet of the plaintiff corporation to approximately nine chartered barges and seriously interfered with the business of the plaintiff corporation which was engaged in removing and disposing of sand and other dry ballast from westbound cargo vessels operated by the United States War Shipping Administration in preparation for their reloading with essential war materials for transportation to the Allies in the European theatre of war, and the defendant well knew and intended that the business of the plaintiff corporation would be seriously injured and damaged through the seizure of its said floating equipment under such process and intended thereby to compel the plaintiffs to withdraw and discontinue their said action for an accounting against the defendant. * * *

"Fortieth.—On March 6, 1945, the plaintiff corporation tendered to the defendant, under protest, the sum of $69,403.28, together with additional interest from the 1st day of March, 1945, to the 6th day of March, 1945, together with $3.50 notary fees, in the total amount of .$69,491.56, and demanded satisfactions of all said mortgages upon the floating equipment of the plaintiff corporation, but the defendant refused to deliver any satisfactions of said mortgages unless and until the plaintiffs signed and delivered to the defendant a certain stipulation prepared by the proctors for the said libellant containing statements of fact which were untrue and which, if signed, was intended to and would have resulted in the defeat of the said action for an accounting; and the defendant advised the plaintiffs that unless such terms were complied with the defendant would proceed at once to seize all the tugs of the plaintiff corporation. * * *

"The said claimant-respondent disclosed in open court during the opening upon said trial that it had entered into a financing arrangement with the Grace National Bank of New York for the filing of a stipulation for value or the payment of the said libellant's claim under protest, conditioned upon the delivery by said libellant of satisfactions of such mortgages.

"During the opening of said trial the said claimant-respondent offered in open court to pay to the libellant at once the sum then claimed by the said libellant to be due to it in exchange for satisfactions of said mortgages, under protest and denying that any part thereof to be due and for the stated purpose of releasing its floating equipment from seizure in said foreclosure action, but the said libellant declined to accept said tender and deliver such satisfactions or release said barges under seizure unless the said claimant-respondent would admit that such sum was owing from it to the said libellant. * * *

"The plaintiffs were informed on March 7, 1945, immediately after the Court ordered the taking of proof to commence as

aforesaid, that unless the barges under seizure were released without further delay, the Grace National Bank of New York, which was arranging to finance the release of said barges and whose representative was then present in Court, would probably withdraw its assistance, in which event the business of the plaintiff corporation would be ruined because of inability to obtain financial assistance without the delivery of satisfactions of said mortgages and while litigation was pending thereon.

"Between February 10, 1945, and March 7, 1945, the plaintiffs had been informed and believed that the defendant and its representatives had approached various current creditors of the plaintiff corporation and had urged them, and had offered the services of said libellant's proctors, to bring actions immediately in rem against the floating equipment owned by the plaintiff corporation, part of which was then under seizure in the foreclosure proceeding and part, namely various tugs, which were being used by the plaintiff corporation to tow the several chartered barges which the plaintiff corporation was continuing to operate in an attempt to remain in business. * * *

"On March 6, 1945, the proctors for said libellant stated to the plaintiffs that unless the said proposed stipulation described in paragraph Fortieth hereof were signed by the plaintiffs and delivered to the defendant without delay, the defendant would seize all the tugs of the corporation plaintiff, and would put an end to its business immediately; and the plaintiffs believed that said threat would be put into execution.

"The plaintiff corporation had been unable to secure any relief from this Court under Admiralty Rule 22 thereof and had been forced on to trial of said foreclosure action contrary to the Rules of said Court and to the stay in said order to show cause and to the requirements of due process of law, and the commencement of the taking of proof as aforesaid presaged to the plaintiffs a long trial with a complicated accounting between the plaintiff corporation and the defendant covering a period of at least twelve years and involving innumerable transactions, which would have required a lengthy reference before a Special Master and during which the plaintiff corporation would have been utterly ruined through its inability to operate the barges under seizure and its tugs which said libellant had stated it intended to seize and which statement the plaintiffs believed would have been carried into effect within another day, thus definitely terminating all arrangements through the Grace National Bank of New York or otherwise for financing the release of said barges.

"During the opening of said trial the said libellant stated that it intended to move to increase the claim in that suit by approximately $25,000 for the stated purpose of increasing the amount of the stipulation for value that might be ordered by the Court, which proposed increase was excessive and oppressive and was not justified by the facts and by the previous demands of the said libellant which the said libellant and its proctors well knew; and also stated that it would retract its election to sue for the alleged debt and would appropriate all of said barges to itself under said mortgage.

"The plaintiffs also believed that an application for relief to the Circuit Court of Appeals for the Second Circuit, even if within the latter's jurisdiction, could not be disposed of before ruin would overtake the plaintiff corporation.

"By reason of the facts hereinbefore set forth, the plaintiff corporation, believed it had no other means of immediate relief from the said duress, unlawful compulsion and abuse of process perpetrated and inflicted by the defendant upon the plaintiff corporation than to make a tender of $69,491.56 to the said libellant which was its total demand as of March 7, 1945, and it therefore unwillingly and in order to emancipate its property from the said actual and existing duress imposed upon it by the said libellant and without admitting that the same or any part thereof was due from the plaintiff corporation to the defendant, tendered the sum of $69,491.56 to the said libellant to be exchanged for satisfactions of all said mortgages in form to be approved by the Collector of Customs

at New York and the libellant's consent to an order of discontinuance of said action upon payment by the said claimant-respondent of Marshal's and Clerk's fees, which tender the libellant accepted and the trial of said foreclosure action was suspended until 10:30 A.M. on the morning of March 8, 1945.

"The proctors for the respective parties thereupon repaired to the Custom House at New York where the form of consent to order of discontinuance of said action was agreed upon, but the Customs Official objected to the forms of satisfactions of mortgages presented by the proctor for the said libellant as insufficient and the parties thereupon adjourned the matter until the following morning, March 8, 1945, at 9:00 at the same place to permit the execution and delivery of proper satisfactions.

"The proctors for the respective parties met at said Custom House as arranged on March 8, 1945, and there were also present the attorneys for said Grace National Bank of New York with all documents prepared for recording of a preferred marine mortgage of said barges from the plaintiff corporation to said Bank, but the proctors for the said libellant arbitrarily and unlawfully declined to deliver such satisfactions to the said · claimant-respondent unless and until it authorized its proctor to sign a consent to the entry of a decree in said foreclosure action for the amount of said tender.

"Sixty-first.—The plaintiff corporation was thus again faced with ruin if its floating equipment were not immediately released and for fear that the financial arrangements with said Bank, of which the said libellant was aware, might collapse if the further unlawful demand of the said libellant were not acceded to, and by reason of the facts hereinbefore set forth, the plaintiff corporation believed it had no other means of immediate relief from the said duress, unlawful compulsion and abuse of process perpetrated and inflicted by the defendant upon the plaintiff corporation, and it therefore unwillingly and in order to emancipate its said property from said actual and existing duress upon it by the said libellant, authorized its proctor to sign such consent and said proctor did so accordingly and said decree was signed by the Judge presiding at said trial upon such consent.

"Pursuant to said tender, the plaintiff corporation delivered the sum of $69,491.56 to the defendant on March 8, 1945.

"The tender described in paragraph Fifty-eighth hereof and the said consent to said decree and said delivery were made and given under said unlawful compulsion, duress and abuse of process by the libellant hereinbefore described and by reason of the gross fraud of the defendant upon the plaintiff corporation whereby the plaintiff corporation was deprived of the free exercise of its will in making such tender and delivery and giving such consent, all of which were without consideration and voidable, and the plaintiff corporation therefore hereby repudiates and rescinds said tender, delivery and consent. * * *"

2. The Entire Colloquy Between the Judge and Counsel Before Entry of The Decree.

"Brooklyn, New York,
"March 7, 1945.

"Before:
"Hon. Mortimer W. Byers, U. S. D. J.
"Appearances:
"Messrs. Foley & Martin, proctors for the Libellant by Mr. James A. Martin and Mr. Christopher Heckman, of counsel.
"Mr. Horace M. Gray, proctor for the Hedger Transportation Company, Claimant.
"(Discussion off the record.)

"The Court: I think perhaps we will have to have an opening from both counsel here.

"Mr. Martin: Your Honor, this is an action brought by Ira Bushey & Sons as assignees of a preferred mortgage, bringing suit against thirty-one boats that have been attached, eighteen of which are out of commission and have not been used for a year, which lie down at Bushey's yards or in his neighborhood, and on which there is due and owing an unpaid balance of $60,700.

"The original mortgage was $600,000 which by various agreements was reduced and part of that indebtedness remitted so that there comes down now a final agreement which fixes the final amount at the sum of $115,000. That was in 1944. The prior agreement was in 1940.

"In 1944, Mr. Hedger, acting for the Hedger Company, signed an agreement stating that there was due and owing, for good and valid consideration, the sum of $115,000. It is likewise so stated in the mortgage and likewise stated in the first reduction agreement of 1940 and in the second one which I have just mentioned.

"In addition to that, it is also stated in the second preferred mortgage, which is not now going to be foreclosed because part of it has been taken care of, and three chattel mortgages filed in various counties of the State of New York, all of which Mr. Hedger participated in and swore in these different papers that it was a good, valid and subsisting mortgage. Now, that is just the history.

"They come along and payments were made, payments were made out of the earnings of the boats, such payments as have been made, and although there was a $600,000 mortgage there was a forgiveness of about $290,000.

"The Court: May I interrupt?

"Mr. Martin: Certainly, your Honor.

"The Court: Is it correct to say that the mortgage was payable in installments?

"Mr. Martin: That is correct.

"The Court: And your statement is that some of those installments have been made?

"Mr. Martin: Have been made, yes, sir, and other parts of the indebtedness have been forgiven by two agreements.

"On February 8, 1945, a $4,900 note—and I might say that partial payments of installments are represented by notes—on February 8th, one of these notes, in the amount of $4,900 was due and remained unpaid. I do not think there will be any dispute that that note has never been picked up. There was another note, the final note of the transaction, which was due on February 15, 1945.

"The Court: What was the amount of that?

"Mr. Martin: $55,600. It gave a credit of $20,000—it was a note of about $75,000—and that was reduced to $55,000. On February 8th, Mr. Hedger caused a letter to be written stating that he would not pay the note of February 8th or the final note of $55,800. Upon receipt of his letter of February 8th—it came to us on February 7th from Mr. Bushey—the letter from Mr. Hedger was dated February 7th, and giving notice that he would not meet the notes, we immediately prepared libels to foreclose the mortgage and claiming that the total amount under the mortgage was due, under the acceleration clause on failure to meet the payments.

"During the lifetime of this transaction, all payments that were made, were never made in cash, they were not cash payments other than those earnings which came from the boats.

"Mr. Hedger, and we may as well bring the whole story before your Honor, in December, December 22nd, served a summons claiming that the transaction was fraudulent—no motion to set aside any mortgages—no application for it—the mortgage is recognized—they wanted an accounting, they said, and a few other things. We expect to meet that if it has to be met but it is the fact that we are compelled to come into this Court to foreclose this mortgage and assert our liens and obtain it and it is for that reason that this suit has been brought.

"I think all that we need to show to your Honor, so far as our prima facie case is concerned and all we intend to offer, is the mortgage and the notes or probably my friend will concede the notes are still outstanding and in our possession and the two agreements fixing the amount, and that will be our case.

"Mr. Gray: Your Honor, this is a culmination of a series of transactions which occurred between Messrs. Bushey and Hedger starting back in 1932. During that period they have been involved in a joint adventure, as a result of which over $1,000,000 in cash and property has been turned over to Bushey and his affiliated

42

companies by the Hedger Corporation and Mr. Hedger, who is the sole stockholder. As a result of that, Mr. Bushey and his associates have been milking the Hedger Company and Mr. Hedger for some twelve years and had them right by the scruff of the neck where they could not help themselves because of the various amounts that they claimed to be owing at that time. It started back in 1932 and they claim there was $155,000 owing, with some slight expenses.

"By the 23rd. of December, 1938, although enormous amounts of money had been paid, Bushey told Hedger, you now owe me $420,000 on account because of what I have been doing for you in the way of charter hire and repairs on certain barges.

"Back in 1932, when this joint adventure commenced, it was provided that the treasurer of the corporation, the secretary-treasurer of the corporation, should be a Bushey employee and that continued up until the 4th of November, 1944. During that time Mr. Hedger was unable to get any accounting of the books and he was unable to put an accountant on them to get a proper picture of the situation.

"The Court: What books do you refer to?

"Mr. Gray: The books of the Hedger Company.

"Mr. Bushey would not permit him to have them audited. Since then, an accountant who will be here this afternoon, has examined the accounts and will testify as to the large amounts which are unaccounted for and which only appear on the books as an unsupported item and that will run over $300,000.

"Now, we got to the point in this present situation where Mr. Hedger is now able to protect himself. He is now able to finance the alleged amount that is claimed to be due by Bushey. We are doing everything we can to pay off. We offered him the money yesterday afternoon and he won't take the money. We offered to put up a bond but they would not take a bond. What he is trying to do and what seems to be the underlying motive, is to avoid any possible accounting between Hedger and Bushey. If this accounting was going to result favorably at all to Mr. Bushey, it is quite understandable that he would not contest it but he does not want to do it and he has been avoiding and fighting it ever since the 10th day of February when this libel was filed and we have been trying to get him off our necks, with these boats. Let him try this case if he wants to and give him all the security that he needs to protect himself in this matter. He only asked for $60,000 for the alleged balance. Back in 1938 there are items of $90,000 that we paid for which there is nothing to show.

"Now, during this time, there was a man named Provo, the treasurer-secretary of the Hedger Company and he was the employee of Bushey and Provo kept close track of the financial situation of the company. He was the only one to whom Mr. Hedger could apply to get information. Provo signed all of the checks and approved all of the bills and Mr. Hedger was just in the hands of Bushey for twelve years, working for Bushey under this set-up, until Provo got out on the 4th day of November of last year.

"We have brought our suit in the Supreme Court of Kings County to straighten this thing out but our friends here are trying to rush this thing through. He has been trying to catch us off balance.

"Mr. Martin: Your Honor, I do not think those statements should be made in Court.

"The Court: Well, no jury is here, Mr. Martin.

"Mr. Martin: There are too many insinuations—why doesn't he try the facts?

"Mr. Gray: We are ready to. While we are trying the facts—and this is the method in which this thing is being abused—they want us to try the facts but they are going to still hold our barges out of circulation so that we will be ruined while they are trying the case.

"The Court: What do you conceive the issues to be in this action, Mr. Gray?

"Mr. Gray: The action here is lack of consideration and if there was any consideration—first we say there is no debt

covered by these notes and secondly, if there was, it has been paid.

"The Court: In other words, you claim that the amount said to be due is not due?

"Mr. Gray: That's right.

"The Court: Then it seems to me, my duty to go ahead and take testimony.

"Mr. Gray: Certainly your Honor must take testimony and we will supply the facts but as I stated before to your Honor, this morning, we are not prepared to go ahead with all of our evidence today.

"The Court: Well, you may be assured that you are not going to be forced. I have tried to make that clear.

"Mr. Gray: But while we are doing this trying, our money has been offered to them and we should not be held up in the operation of our boats, which are still lying idle. We are still offering them the money and our boats should not be held up while trying this case because I think your Honor will find this matter will have to be referred to a Special Master to take this testimony and I hope that your Honor will give us some relief—we are here on the question of relief—the money was offered yesterday afternoon, all of the money that is asked for here and there is no reason why we should go ahead and try this case when our money is ready to be given to them.

"We had a certified check for them yesterday afternoon and we were here with it this morning and we are ready to hand it over to them any time and get rid of this and not take up the time of the Court with unnecessary trial. We can take care of that in the present litigation in Kings County. I cannot see any reason why we should try two cases, one in the Federal Court and one in the State Court, when one may be wholly disposed of without any trial at all and we have the money here ready to give it to them. They don't want the money; they want to avoid an accounting, your Honor, and are doing everything possible that they can and are abusing the processes of this Court by holding up our boats when we have tried to give them this money and have made a legitimate offer.

"Their answer has been that even if we take the money, the lien of the mortgage is not released. Now, the answer to that is in the old case of United States v. Ames, 99 U.S. 35, 25 L.Ed. 295, and I think your Honor knows the law on that as well as I do—

"The Court: I wish you were right about that.

"Mr. Gray: I am. May I show this case to your Honor? If your Honor will read that case which holds that when a stipulation for value is filed it removed the lien from the res.

"The Court: Well, now, I am not familiar with the provisions of the Admiralty Rule on this subject but is there anything under the Admiralty Rule whereby you can pay your money in Court? That, of course, is possible under the Federal Civil Rule. I am just wondering if there is any way by which you can pay the amount that you concede to be due in Court and thereby release the vessels and allow the litigation to continue. What is the objection to that, Mr. Martin?

"Mr. Gray: The objection is he will not still release our mortgages.

"The Court: But have you the right to pay the money in Court?

"Mr. Gray: Yes, sir, I have.

"Mr. Heckman: There is no objection to that, your Honor. They want more than that, they want to tender the money in Court conditionally and at the same time they say deliver satisfactions of the mortgage which are admissions of payment and which will also release the Hedger Company in personam, which is the party here, and then if for any reason the Court requires further security which the Rule provides and the Rule provides that the order for further security can be enforced by reattachment—where they have sent out to attach some boats which have been released or a mortgage on which, as soon as it is released, there will be more liens placed and they will come in ahead of us.

"We do not have to satisfy this mortgage until we have the money in hand. If we are not entitled to it then the mortgage is not satisfied but a Court order is entered

changing the mortgage. Every time they offered the money, they made it conditional on satisfying the mortgages. That is the objection.

"Mr. Gray: Your Honor, we are entitled to a satisfaction of a mortgage when we give them the money.

"Mr. Heckman: Well, you give it and we will give you satisfaction, right now.

"Mr. Gray: Where are your satisfactions?

"Mr. Heckman: They are all ready and prepared.

"Mr. Martin: We want the money without conditions or strings attached.

"Mr. Heckman: Let them give us the money and we will give them satisfactions this minute.

"Mr. Gray: I can get the check in here by 2:00 o'clock.

"Mr. Martin: Well, put it on the record.

"Mr. Gray: We are ready, your Honor, to deposit the money in Court and get our satisfactions of these mortgages—

"Mr. Heckman: No, make it an unconditional payment of the money and we will give the satisfactions.

"The Court: There is a difference between depositing the money in Court and litigating the issues and paying the money you concede to be due and therefore remove the litigation.

"Mr. Martin: We are ready to take the money if they will put on the record that it is due and owing to us, and release the mortgages, but they want—

"Mr. Heckman: They want us to admit satisfaction of the mortgage when we have not got the money in hand.

"The Court: Well, you gentlemen see what you can do by 2 o'clock. We will take a recess now until 2:00 o'clock P.M.

"(Thereupon, a recess was taken.)
"Afternoon Session

"The Court: Have you gentlemen made any progress during the recess?

"Mr. Gray: You mean in the way of getting together?

"The Court: Yes, sir.

"Mr. Gray: No, sir, I only got back at 2:00 o'clock on the dot.

"It seems to me that this is really a matter of equity under Rule 22. That rule provides, as your Honor knows, that in the case of an attachment of property or the arrest of a person, the person to be arrested or any person having the right to intervene in respect to the thing attached, may, upon evidence showing any improper practice or manifest want of equity on the part of the libelant, have an order from the Judge requiring the libelant to show cause why the rest of the attachment should not be vacated.

"Now, we have the money and we have the intent either to give him a bond and try the case or pay him his money under protest and then settle the question of whether he is entitled to the money later on.

"The law requires, in fact it provides under that Ames case which I showed your Honor, that when a stipulation for value is filed, it relieves the res of the lien and what they are trying to do is to have the security and the lien, too, and the purpose for carrying that out is clearly to hold up our floating equipment and force us to come to terms and discontinue this action for an accounting. The accounting action is the whole crux of their refusal to treat this matter from an equitable standpoint. Although they state that they will not release the barges and let them be operated, they have not stated any reason why and under the terms of their own mortgage that they are suing on here, it provides that a receiver may be appointed for the operation of the equipment while the matter is being tried—that is shown on page fifteen of the mortgage.

"Mr. Martin: That is the mortgagee's right.

"Mr. Gray: Certainly, but that is contemplated and the mortgagor also has a similar right under Section 962, Title 46 of the United States Code Annotated, that is, the Court has discretion to appoint receivers to operate the boats while the matter is in process. But here, we have the money here and the only reason they won't take it is because we won't say that we haven't any other claim against them.

"Any one has the right at any time to tender money and tender it under protest.

If they want to carry out their protest, they are entitled, as a matter of law, to proceed. If we proceed with this case, we must go through with the accounting here; otherwise if we get into the State Court and a judgment has been entered against the claimant-respondent here, the libelant will plead res adjudicata.

"Mr. Heckman: Well, make your tender on the record, please, Mr. Gray.

"Mr. Gray: The claimant-respondent tenders the sum of— Do you claim now, Mr. Martin, any more than the sum of $69,403.28?

"Mr. Heckman: Answering that, we served you with a notice that on the trial of this action we would move to amend the libel to increase the amount of damages demanded. That motion has not been made.

"Mr. Gray: On Mr. Martin's opening, he said that the sum was $69,700.

"Mr. Martin: If you will pay that without any strings, I am willing to accept it unconditionally and that is the only way to accept it. It will be accepted by me— plus interest and costs, of course.

"Mr. Gray: The interest and costs amount to how much?

"Mr. Martin: I will state that—this payment to me—speaking for the libelant—

"Mr. Gray: We have here—

"Mr. Martin: Will you make your tender, please?

"The Court: From perusing Article 21 of the allegation, there is due the libelant $60,700, with interest on $115,000 at the rate of six per cent. from August 28, 1944, amounting to $3,066.66 together with reasonable attorney's fees amounting to approximately $10,000, as nearly as same can now be ascertained, amounting in all to $66,766.66. Omitting the last item, I suppose the amount of interest is computed as of February 10, 1945?

"Mr. Martin: That is right, your Honor, and we have agreed on counsel fees at $5,000. That is in the motion papers that were signed yesterday.

"$5,000 fees, and expenses.

"Mr. Gray: The figures you gave us on the 1st of March, with interest to that day,

had a balance of $60,700; interest on $115,000 from August 28, 1944, in the sum of $3,507 and counsel fees and expenses $5,015 and towing $181.28, which all totalled up, comes to $69,403.28. Then yesterday afternoon we offered you $84.78 interest.

"Mr. Martin: I will take your statement on it, if you have figured it.

"Mr. Gray: Yes, including yesterday plus $3.50 notary fees for acknowledgments on the satisfactions.

"Mr. Martin: You can have that item— what is it?

"Mr. Gray: $3.50.

"The Court: Now, that is a total of $69,491.56.

"Now, is it agreed that the amount is being tendered?

"Mr. Gray: Yes, sir.

"The Court: That is the amount that you demand, Mr. Martin?

"Mr. Martin: Can we get an offer on the record how it is tendered?

"Mr. Gray: We are tendering this money to obtain the release of our barges.

"Mr. Heckman: In satisfaction of the libelant's claim?

"Mr. Gray: To obtain the release of our barges and without admitting that any part of it is due.

"Mr. Heckman: There is no provision in the Rules that a tender of that kind—

"Mr. Gray: When a stipulation is filed—

"The Court: Well, now, just a minute, gentlemen, let us see how far apart we are. If this money is paid into the Court it could be received in lieu of a bond instead of the filing of a bond and the money would be deposited in Court to await the outcome of the case.

"Mr. Martin: That is right.

"The Court: That is one possibility. The other is the payment of the amount due, according to the libel, to the libelant in the payment of this debt or the claim asserted in the libel. Now, which is the position that the claimant is taking? Is the claimant paying the sum into the Court to accomplish the release of the attachment so that the vessels can continue to operate

or is claimant paying the amount asserted to be due by the libelant?

"Mr. Gray: First, your Honor, claimant is paying the amount asserted to be due by the libelant without admitting that the amount is due.

"The Court: What you really mean is that you would like to reserve the right to litigate elsewhere?

"Mr. Gray: Yes, sir.

"The Court: The question of which party is in debt to the other, as the outcome of an accounting?

"Mr. Gray: Prior business relationships, your Honor.

"Mr. Heckman: If I might interrupt, your Honor. If the claimant-respondent makes a tender without admitting that that amount is due, that leaves a question for your Honor to decide, whether or not it is due and that is the question we want decided and, of course, if that were not decided today the Court would want to get enough money in the registry of the Court to pay whatever interest would accrue during a possible appeal and Court costs and so forth, but it would not be a sufficient amount in lieu of a bond.

"Mr. Martin: It will not satisfy the mortgages of record.

"Mr. Heckman: They will not be satisfied until we have the money in hand.

"The Court: What amount of bond would be acceptable—if this were a plain suggestion of bonding the attachment?

"Mr. Heckman: Well, your Honor, that brings up the notice of motion that we served that on the trial we would move to amend the libel to increase the demand of the face amount from $60,700 to $109,-000. The interest would stay the same and the attorney's fees would stay the same, so that increases the figure by some—

"The Court: Something over $25,000, isn't it?

"Mr. Heckman: Approximately $30,000 more.

"Mr. Gray: We will object to any such amendment because there is no affidavit to support such a motion and there is nothing in the record to show that it is owing. In fact, the admissions on the record show

that only $60,700 is owing on the record and also, your Honor, may I point out that the tender is a complete defense to an action, that any tender under protest is a good tender, so it seems to me we are in a position where your Honor may dismiss this mortgage foreclosure.

"Mr. Heckman: I see nothing in the Rules, your Honor, to provide for a tender under protest. The only thing I see is the tender of an amount admitted to be due. If they want to make a tender which they admit to be due, I have not yet made the motion to amend the libel.

"The Court: I wonder, as a practical matter, if you could not find an agreement on this basis: Suppose the claimant were to admit that according to the terms of the preferred mortgage, the amount which we have already arrived at is the amount due and that by paying that sum in order to terminate the existing litigation in this Court, the claimant desires to retain his right to litigate in the accounting proceeding all issues which are appropriate to that proceeding. Wouldn't that effect the purpose you have in mind by instituting this cause and at the same time not limit or circumscribe whatever issues are appropriate to the accounting proceeding?

"Mr. Heckman: The difficulty with that, your Honor, is that this accounting proceeding may show a greater amount to be due under the mortgage for which we have a lien on these boats. If he wants an accounting proceeding and is willing to be bound by the outcome, that is all right with us. But if the proceeding shows under the mortgage itself there is a greater amount due, we are entitled to have the boats as security for that.

"Mr. Gray: My friend claims $60,700 and if we pay that, that is all he is asking for. I have stated time and time again that we are here tendering the money.

"Mr. Martin: And I have stated time and time again if you pay that we will give you satisfaction of all the mortgages but pay, to my mind, means pay and not give it with a string.

"Mr. Gray: The law specifically states, 62 Corpus Juris, that while as a general rule a tender is an admission of the amount

due equaling the sum of the tender, it has been held that if the tender is otherwise valid the fact it is under protest does not invalidate it.

"Mr. Heckman: I think we are entitled to have the matter of whether you are entitled to the money or not decided in this forum.

"The Court: It seems to me that the situation precisely is this: The claimant is not prepared to show that if this preferred mortgage were the only basis of the parties' relations, the claimant would not propose any defense in the existing action —I think he says that under the preferred mortgage this amount is due but he has in his mind that, by reason of other relationships between the parties, there may be a result which would show that the libelant is indebted to the claimant and he would like to offset that, if he has a chance to, as against his mortgage debt. Is that about right?

"Mr. Gray: Yes, sir. I do not wish to be barred in the accounting action.

"Mr. Heckman: It would seem to me that if Mr. Gray is right in his theory, he is running absolutely no danger of paying this money now.

"The Court: What he means is he would like to pay this without prejudice to whatever rights he has in the accounting proceedings.

"Mr. Gray: That is right, your Honor.

"Mr. Heckman: The difficulty with that is if we take this sum and the boats are released and the accounting shows that we are entitled to a greater amount under the mortgage, we have lost our security.

"The Court: Well, after all, Mr. Heckman, that is what you have asked for, isn't it?

"Mr. Heckman: That is right.

"The Court: I am wondering if there is any harm in taking the claimant's word on that basis—why don't you assume that and agree that that transaction is without prejudice to any matters to be litigated in the accounting proceeding?

"Mr. Heckman: The only thing that is involved in the accounting proceeding, even on Mr. Gray's statement, is whether payments were on account of this mortgage or on account of other boats. If the accounting proceeding shows that the payments on account of this mortgage were not as we admit, we should have the benefits of this accounting proceeding he invokes and we would not have that if this mortgage is discharged. That terminates the matter then and we suffer if an accounting would have helped us.

"Mr. Gray: But if they foreclose this mortgage and get this $69,000 odd, as the result of litigation, they still would be in the same situation, in the accounting proceeding, unless they use this on a plea of res adjudicata.

"The Court: Well, I suppose the question of the amount due on the mortgage necessarily involves whatever payments have been made in the reduction of them. There is no escape from that, is there?

"Mr. Gray: No, sir.

"The Court: And you feel that you are not willing to foreclose your client on that?

"Mr. Gray: No, sir.

"The Court: Then, why isn't it best for you, if that is your situation, to bond this attachment and let the bond stay here? That will release you both and then go ahead and litigate your accounting proceeding.

"Mr. Gray: We would like to do that and we attempted to do it but when the bond is filed it takes the place of the mortgage lien but Mr. Martin will not give us the satisfactions of the mortgages and therefore we are having difficulty in financing it. We are obtaining another mortgage from another financial source. In order to complete that transaction, we must have the satisfactions of the mortgages.

"Now, the situation here is analogous to that in real estate mortgages, under 333(b) of the Real Estate Law of the State of New York [Real Property Law, Consol.Laws, c. 50, § 333-b], in that where a tender is made of a mortgage, the satisfaction pieces must be delivered by the mortgagee to the mortgagor in exchange for the money, and there is nothing in the Federal Statute to the contrary and the logic of the situation and the equity of the situation should

equally apply. We are ready to bond if they will give us satisfactions of the mortgages which are immediately transferred to the bond in Court.

"The Court: Hasn't he the right to bond, Mr. Heckman?

"Mr. Heckman: Of course he has, your Honor, but on the filing of the bond, I doubt if your Honor on application would direct the libelant to satisfy the mortgage. I think that nobody is asked to deliver a satisfaction of a mortgage until he has the money in hand. The bond is only as good as the bonding company and bonding companies have been known to go out of business.

"The Court: Is there any difference between releasing the mortgage and giving a satisfaction? I am sure that you do not urge that you are entitled to both your attachment and a bond. You are not entitled to your lien on the vessels and a bond, too, are you?

"Mr. Heckman: No, the maritime lien is transferred to the bond. This is a maritime lien created by statute. We have the right to sell the boats or we have the right, after our mortgage has been adjudicated, to take possession of the boats,—not sell them,—to take possession ourselves. If we are forced to take a bond, the Court that directs us to do it is depriving us of a right under the statute and under the mortgage that we may physically take the boats themselves upon the occurrence of a default in the mortgage.

"To answer the question in your Honor's mind, why we should not give satisfaction of a mortgage, I do not think that anyone should be asked to do that until they actually have the money. If he will tender us money in payment of the mortgage, we will give him satisfaction.

"The Court: Would you be willing to release the attachment on the boats?

"Mr. Heckman: If they file a bond on the amount fixed by your Honor and if you raise the amount of the libel on my motion and they bond it for that amount, of course we will release the attachment—we have no choice. We won't, however, give satisfactions and I do not think it is fair that we be asked to give satisfactions until we have the money.

"On a tender we will give satisfactions, on a bond we will release the boats.

"The Court: He said he would be willing to release the attachment from the boats which would result in your being able to operate them, pending the outcome of this litigation. I think that the bond only takes the place of the boats and I do not think that that disturbs the lien of the mortgage.

"Mr. Gray: Under the Ames case, it does, your Honor. As your Honor pointed out, you cannot have the lien and the bond, too, and when your vessels are discharged from the lien of attachment, that lien immediately attaches to the bond in Court.

"Mr. Martin: But, your Honor, this is a lien of a preferred mortgage.

"The Court: That discharges the lien of the attachment but not the lien of the mortgage.

"Mr. Gray: I think your Honor will find it does because the lien of the attachment is based on the lien of the mortgage.

"The Court: But the lien of attachment is a temporary way to bring the res into Court—the bond, therefore takes the place of the res, it does not take the place of the lien.

"Mr. Gray: I think that the case that I showed your Honor this morning, the res itself is entirely relieved of the lien.

"The Court: I haven't had a chance to read that Ames case yet, Mr. Gray.

"Mr. Gray: Otherwise, they would still have the lien and they would have the bond, too, and they are only supposed to have security, one set of security and there would be no damage in turning over the bond and releasing the vessels from the lien of attachment because nothing would prevent them from reattaching them and we would have to put up another bond.

"The Court: Not in this cause, not for the foreclosure of this preferred mortgage.

"Mr. Gray: Yes, your Honor.

"The Court: Do you mean to say that if a bond were filed today and accepted and the vessel was released from this attachment, that they could turn around and get out a new attachment on the same cause?

"Mr. Gray: If the res was not relieved from the mortgage.

"The Court: It doesn't sound like common sense to me.

"Mr. Gray: They only have one security, your Honor, they have the security of the lien on the res.

"The Court: Yes, but they are not entitled to foreclose that until they get a decree.

"Now, the object of an attachment is to bring the res into court so that it cannot be removed, so that it will be here when there is a final adjudication. The bond of the attachment is to relieve the res of that temporary restraint, without touching the original lien.

"Mr. Martin: That is so and we are willing to do it.

"Mr. Gray: That Ames case is the authority on the subject, your Honor.

"The Court: What kind of a case was that?

"Mr. Gray: I think it was a prize case. There was a lien of prize and generally the law stated in that case was that where the lien upon which the suit is brought—no, it states that where a suit is brought upon a lien and a bond is filed with the court, that relieves the res completely and the libelant must look to the stipulation in the court for a recovery under a decree. I am sure that is the law.

"The Court: What is the origin of the lien in the Ames case, a seizure?

"Mr. Gray: Yes, sir.

"The Court: Well, the lien here is through a mortgage and it seems to me there is a manifest difference between a lien created by a mortgage and a lien arising from the seizure of a prize vessel.

"Mr. Gray: I don't think the Ames case would be decisive in reference to a preferred mortgage. Perhaps it would but it does not seem to me that that should be so. However, I would like to see if we cannot agree on the disposition of this thing so that the rights of everybody will be reserved.

"Mr. Gray: Our main purpose here, your Honor, is to relieve these barges from the attachment so that they can start to work and we are ready to secure the libelant. We have the money here in Court but he wants two securities for the same amount.

One, he wants to keep the lien of his mortgage, and, secondly, he wants the money or a stipulation for the same amount, and he is not entitled to both, as a matter of plain common sense, outside of the Admiralty Law relating to stipulations and maritime liens.

"Mr. Heckman: Mr. Gray wants to put up a bond—he wants to deny there is any money due us and put up a bond, and at the same instant wants us to give a satisfaction of a mortgage that we want this Court to foreclosure.

"If we give him a satisfaction, I see no other result but that the mortgage is wiped off. Every other creditor in New York Harbor looks at the records and sees that the mortgage has been satisfied.

"The Court: You mean, it might promote existing liens now subordinate to the mortgage?

"Mr. Gray: That would not affect the mortgagee in this case because he has the money and the security in Court.

"Mr. Heckman: Do you want us to ask for possession of boats that we are entitled to under the mortgage? We ask to foreclose and that gives us the right to possess.

"Mr. Gray: Your Honor, this is clearly an attempt to hold these boats up and force us into withdrawing our accounting action.

"Mr. Martin: I drew this libel, your Honor, and I drew it without consulting Mr. Bushey even and after I drew it, I asked him if I could have his consent to file it and it was not drawn as you are making the statements here. First of all, you said that we had a treasurer in there. I will state to your Honor right now that the employees of the company were hired by Hedger and brought over from his bankrupt company to us.

"The Court: Well now, we are getting a little bit away from things. I would like to venture, if I can, that you have nothing to lose by letting him pay this money to you as demanded in the libel, without prejudice to his right to urge in his accounting action that he is entitled to greater credits on the preferred mortgage than would appear from the payment of the sum. I really think you have nothing to lose by that.

"Mr. Heckman: I think we have this to lose, your Honor: If the accounting goes unfavorably to the respondent and shows that we are entitled to a greater amount under the mortgage then we are entitled to it and we will enforce the rights that the accounting gives. This mortgage was to secure the original indebtedness of some $600,000.

"The Court: Not when you acquired it.

"Mr. Heckman: $530,000 when we acquired it and the present libelant forgave about $200,000 at least.

"Now, if we take this money now in satisfaction of the mortgage, reserving to them the right to litigate between us how much is due and it turns out there is a great deal more due us, we have no such means of collecting it as we have now. This Court is competent to pass on all of the issues in this case and this is the only Court competent to foreclose the mortgage.

"The Court: But the only issue that this Court has got to pass on would be the amount due, arising from a series of transactions, and that would probably take a long time.

"Mr. Heckman: I am wondering if it would take more than a half hour. The libelant's case will go in in ten minutes.

"The Court: Well, of course, I do not know.

"Mr. Heckman: You have only heard one side so far, your Honor.

"Mr. Gray: His Honor has not heard all of one side even.

"The Court: Well, suppose we go ahead and try the case. A tender has been made and declined, is that right?

"Mr. Martin: That is right. As a matter of fact, there is no tender on the record.

"The Court: Well, he says he tendered the money but reserves the right hereafter in another litigation to allege that the amount paid is not, in fact, the amount due. Perhaps we had better have the tender read.

"(Previous colloquy and tender by Mr. Gray read by the reporter.)

"Mr. Heckman: My position is that is not a tender, your Honor.

"The Court: Well, let us assume it is a tender. Let us assume that I am wrong in thinking it is a tender but for present purposes let us call it a tender—do you accept it or decline it?

"Mr. Heckman: If it is a tender in payment of the satisfaction of the mortgage, it is accepted.

"The Court: That doesn't answer my question.

"Mr. Heckman: I am sorry, your Honor, but the tender was conditional and I think my answer is entitled to be just as conditional as the tender was.

"The Court: No, I think it is up to you now. Either you say the tender is acceptable or the tender is declined. I think that is your next move.

"Mr. Heckman: If I might be technical for a minute, the tender should be accompanied by the money.

"The Court: Of course, if you are not satisfied that is a legal tender, you are quite right and the money will have to be produced.

"Mr. Heckman: I think under the Rules it is not a legal tender. It is not legal unless the money is in Court.

"Mr. Tibbetts: Your Honor, this check is drawn only on condition that satisfactions of the present mortgages are obtained and there is a discontinuance of the action, so that a new mortgage can go into effect. (Exhibiting check.)

"The Court: Is it a certified check?

"Mr. Tibbetts: Yes.

"The Court: And what amount is it?

"Mr. Tibbetts: $69,403.28.

"The Court: As to that, Mr. Heckman, is there any objection made that it is made in the form of a certified check?

"Mr. Heckman: To whom is it payable, your Honor?

"Mr. Tibbetts: It is by the W. E. Hedger Transportation Corporation, payable to Foley & Martin, Attorneys for Ira Bushey & Sons, Inc., certified, that is, the check is on the Grace National Bank and certified by that bank. I am not authorized to surrender the check, however, at this moment.

"Mr. Heckman: There you are.

"The Court: Either there is a tender or there isn't a tender.

"Mr. Gray: I also tender in cash the balance between that and the amount stated previously by Mr. Martin.

"The Court: Yes, Mr. Gray, but this gentleman says that he is exhibiting a check but he is not tendering it. Let us be precise. We either have a tender to deal with or we haven't.

"Mr. Gray: We are in this situation, your Honor. Under the Rules—Rule 22 of this Court, and this is in the memorandum of law which I handed to your Honor—

"The Court: I will have to look at the Rules, just a minute, please.

"What do you say is improper practice?

"Mr. Gray: In declining to deliver satisfaction of the mortgages in exchange for a stipulation for value.

"The Court: I do not hesitate to say it is not a showing of the nature of equity on the part of the libelant. At least it is certainly debatable. So much of your motion I do not regard as well founded. What is the improper practice?

"Mr. Gray: The improper practice and the nature of equity is the same situation—declining to give us satisfactions upon the filing of a stipulation for value in the amount which they claim and also in holding our barges under an attachment after we have offered to them the complete sum which they have demanded. We did that yesterday afternoon.

"The Court: You see, that is another matter. You offer the amount demanded in the libel. That is assuming that what has taken place this afternoon amounts to an offer, which I think is somewhat of an assumption, but you do not make that offer unconditionally, you offer it reserving the right to litigate in an accounting cause the amount due on the mortgage.

"Mr. Gray: I offer it without admitting it is due, that is what I am doing, your Honor.

"The Court: You see, it would be so much simpler if you just paid it and kept quiet. Here, you say, is the money but I do not admit that I owe the money. Where does that leave anybody?

"Mr. Gray: It leaves them in the position that anyone has the right to make a tender. If you demand a sum of money from me and I tell you I do not think I owe it to you but here is the money, the tender is good.

"The Court: That brings us down, then, to this tender—do you consider that you have made a tender?

"Mr. Gray: Yes, sir, we have a certified check which will be delivered to them upon the delivery of the satisfactions.

"Mr. Martin: And the discontinuance of the action.

"Mr. Gray: The action would be discontinued as a matter of course.

"The Court: You mean the satisfaction of the mortgages?

"Mr. Gray: Yes, sir.

"The Court: So that is merely in line with what you have already said.

"Mr. Gray: Yes, sir.

"The Court: It does not occur to me that is a tender for the reason that I have tried to state. You say I am wrong about that and I may be.

"Mr. Gray: You mean with respect to the line?

"The Court: Yes.

"Mr. Gray: May I submit a memorandum to your Honor the first thing in the morning on that?

"The Court: Surely, and Mr. Heckman and Mr. Martin may also submit a memorandum.

"Mr. Heckman: They talk about us abusing process and here they are in Court ready to go to trial and they find an excuse for not proceeding.

"The Court: I do not intend to withhold the start of the trial. I simply want further light on this matter. We can go ahead with the trial.

"Mr. Heckman: All right, your Honor.

"I now offer in evidence the original mortgage dated March 21, 1939, made by the respondent, W. E. Hedger Transportation Corporation, as mortgagor, to the New York Scow Corporation, mortgagee, and I call the Court's attention to the fact that following page 22 of the mortgage is a schedule setting forth the names of the

vessels which are the subject-matter of this mortgage.

"The Court: Was that filed?

"Mr. Heckman: That is shown by the stamp on the reverse side thereof. It was filed in the Customs House, New York, New York, on April 3, 1939, received for re- cording at 9:00 A.M. on that day, and it is recorded in Book PM 65, page 12, and the endorsement is by Harry M. Duerning, Col- lector, by F. J. Miller, Clerk.

"Mr. Gray: Your Honor, may I have a short recess to confer with my client?

"(Short recess taken.)

"Mr. Gray: I have no objection.

"(The above mortgage received and marked, "Libelant's Exhibit 1.")

"Mr. Gray: If the Court pleases, we ten- der the sum of $69,491.56.

"Mr. Heckman: Let us see you do it, where is the money?

"Mr. Tibbetts: Your Honor, I am asked to present this check again and say that the check has been prepared ready for delivery on receipt of satisfaction of the mortgages and discontinuance of this action, concur- rently—that is, at the time when the new mortgage can be recorded.

"Mr. Gray: And this check is made pay- able to the order of Foley & Martin, at- torneys for Ira S. Bushey & Sons, Inc. and is in the sum of $69,403.28. Therefore, in addition, I tender, in cash, the sum of $94.84.

"The Court: Then, we really haven't moved ahead one centimeter, have we?

"Mr. Gray: Oh, yes, your Honor.

"The Court: I think not. This is a conditional tender, that is, you will pay the money if you receive satisfaction of the mortgages.

"Mr. Gray: That condition has already been approved by the other side because they said they would take the tender and give us satisfaction of the mortgages.

"Mr. Heckman: We will give the satis- factions on an unconditional tender.

"Mr. Tibbetts: Of course, it is under- stood that the satisfactions are to be satis- factory to the attorneys.

"Mr. Martin: The satisfactions are right here.

"The Court: I think they should have an opportunity to examine them.

"Mr. Gray: May this check and this cash be delivered in the Customs House where it is usual to pass these papers, so that there can be no intervening liens filed, and that, of course, can be done tomorrow morning.

"The Court: I don't think Mr. Heckman will stand on that kind of ceremony but do you wish to examine the satisfaction pieces in connection with the tender?

"Mr. Gray: No, sir.

"Mr Heckman: They are all here, exe- cuted. We tender the satisfaction pieces to counsel, for his examination, being the satisfaction of the mortgage previously marked here in evidence as Libelant's Ex- hibit 1, being an original and a duplicate, which I understand to be a Customs House requirement, and executed by the President of Ira S. Bushey & Sons, Inc., with the corporate seal and the usual acknowledg- ments.

"I can state to your Honor that to se- cure the same indebtedness, there was a mortgage on some enrolled vessels which did not have a sufficiently high status to have a preferred mortgage and I now submit for their examination, the satis- faction of those other mortgages.

"Mr. Gray: May it be understood that the papers will be passed and the money passed to the libelant at the Customs House?

"Mr Heckman: No, the money and the papers will pass right here. We do not want to try this case in the Customs House.

"The Court: Will you agree that the tender is kept good if the money is pro- duced at the Customs House tomorrow morning at 9:30, so that you can exchange it then for these satisfactions?

"Mr. Heckman: If, before we leave, we can agree that these papers I am showing now are to be delivered and that is all that is to be delivered.

"Mr Martin: We cannot just discontinue the action here, the Marshall and the Clerk must be taken care of.

"Mr. Tibbetts:[1] I want it fully understood, your Honor, as representing the lender of the new money, that we must have papers at the Customs House that will satisfy the officer in the Customs House who records the mortgages to accept this new mortgage.

"The Court: I understand that perfectly. The purpose now is for you to satisfy yourselves as to their sufficiency.

"Mr. Gray: But the man in the Customs House may not agree with us because they have certain rules that they rigidly follow.

"The Court: Mr. Heckman wants to see if he satisfies you and if he does then I think he is able to deal with the man in the Customs House.

"Mr. Gray: May we examine them now and then adjourn to the Customs House?

"Mr. Tibbetts: There are thirty-six of these documents to be gone over and certified copies made, to be put on the ships.

"Mr. Heckman: That is the new mortgage.

"Mr. Tibbetts: What difference does it make to you whether it is this afternoon or tomorrow?

"Mr. Heckman: We do not want to become involved in any disagreements between the new mortgage people and yourselves.

"Mr. Tibbetts: Well, I am not authorized to deliver any check until we know that the conditions are such that we can put our new mortgage in for recording. There is a slight amount of conforming which was delayed on account of this controversy and it certainly would not be possible to complete the recording this afternoon.

"Mr. Heckman: Well, certainly the Collector could this afternoon pass on our satisfactions, which is all we can give them.

"The Court: Why don't you see what you can accomplish this afternoon? Take an adjournment now until tomorrow morning and see what you can accomplish.

"Mr. Gray: Very well, your Honor.

"The Court: We will recess now until 10:30 o'clock tomorrow morning.

"(Whereupon a recess was taken.)

"Hearing Resumed
"Brooklyn, New York,
"March 8, 1945.

"Before:
"Hon. Mortimer W. Byers,
"U. S. D. J.

"(Appearances as heretofore noted.)

"Mr. Gray: Your Honor, we are ready to have your Honor sign a decree under our tender of yesterday afternoon.

"The Court: As I understand it now, the satisfactions have all been recorded and filed in the Customs House?

"Mr. Gray: No, sir, the satisfactions are being held over in the Customs House, together with the mortgage. As soon as your Honor signs this consent decree then Mr. Heckman will consent to a discontinuance of the action, upon the payment of costs to the Marshal and we will then go to the Marshal's office and turn the money over.

"Mr. Heckman: That is not just it. I will ask the Court to sign this decree which provides for a recovery. I will sign this in the Marshal's office when you turn over the money.

"Mr. Gray: That is all right. Then, the Marshal has to 'phone to the Collector of the Customs so as to release the vessels and then the mortgage and the satisfactions will be duly recorded.

"The Court: All right. I am now signing the order (order signed and consent decree signed).

"Mr. Heckman: Thank you, your Honor. I think that terminates the matter.

"The Court: Will the motion be marked withdrawn?

"Mr Gray: Yes, sir.

"Mr. Heckman: That is correct, your Honor.

"The Court: Very well. The motion is considered withdrawn."

---

[1] Bushey, in its brief, states that Mr. Tibbetts had been previously identified as counsel for the bank.